# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

=================================

## ON SECOND MOTION FOR REHEARING

=================================

## NO. 03-04-00379-CV

**Edwards Aquifer Authority; Gregory M. Ellis, General Manager of the Authority, in his official capacity; and Carol Patterson, Michael Beldon, Levi Jackson, Rafael Zendejas, Susan Hughes, Doug Miller, Ken Barnes, Bailey Barton, Hunter Schuehle, Luana Buckner, Bruce Gilleland, Rogelio Munoz, George Rice, Johnny A. Rodriguez, Jr., and Cheryl Gilpin, in their official capacities, Appellants**

**v.**

**Chemical Lime, Ltd., Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT NO. C2002-0547 A, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING**

## O P I N I O N

We deny appellants' motion for rehearing, withdraw our opinion and judgment dated June 2, 2006, and substitute the following in its place.

In the 1993 Edwards Aquifer Authority Act (EAA Act), the legislature established a new regulatory scheme to govern use of groundwater from the aquifer and a new agency, appellant Edwards Aquifer Authority (the Authority), to administer the regime. The legislature granted a preference under the EAA Act's permitting regime to existing users of aquifer water. To obtain the preference, the EAA Act provided that existing users had to file with the Authority a declaration of

historical use by March 1, 1994—exactly six months after the EAA Act's effective date. Intervening legal developments barred implementation of the EAA Act until after the supreme court rejected constitutional challenges to the EAA Act and vacated an injunction against its enforcement in *Barshop v. Medina County Underground Water Conservation District*, 925 S.W.2d 618 (Tex. 1996). In lieu of the then-expired 1994 statutory deadline, the Authority, relying on an interpretation of *Barshop*, set by rule a deadline of December 30, 1996—six months after the *Barshop* opinion was issued—for existing users to file declarations of historical use. Appellee Chemical Lime, Ltd., whose New Braunfels plant had used aquifer water since the early 1900s, filed its declaration on January 17, 1997. Over three years later, the Authority rejected Chemical Lime's declaration for being untimely filed, thereby depriving Chemical Lime of preference as an existing user.

Chemical Lime sought a declaration in district court that the Authority's filing deadline rule was not authorized by the EAA Act and *Barshop*, and, in the alternative, that Chemical Lime had substantially complied with the filing requirements. The district court rendered judgment invalidating the rule and declared both that Chemical Lime's declaration had been timely filed as a matter of law and that Chemical Lime had substantially complied with the filing requirements even if the Authority's deadline was proper. It also awarded Chemical Lime attorney's fees. The Authority appeals this judgment.

Construing *Barshop* in light of the standards governing when appellate court judgments reversing lower court judgments take effect, we affirm the district court's judgment invalidating the Authority's filing deadline and declaring Chemical Lime's historical use declaration to be timely filed. As this ground alone supports the district court's judgment, we do not reach

Chemical Lime's issues concerning the district court's alternative substantial compliance ground. We also affirm the district court's award of attorney's fees to Chemical Lime.

## BACKGROUND

As its name suggests, Chemical Lime produces lime, a product used in road construction, steel manufacture, water treatment, and the removal of sulfur compounds from emissions from coal-fired plants.[1]  In 1999, Chemical Lime bought APG Lime, including a lime-production plant in New Braunfels.  This plant, in operation since 1907, uses water for lime processing, dust suppression, the cooling of equipment, drinking water, and sanitation.  The plant's sole water source is well water from the Edwards Aquifer, an underground system of water-bearing formations that includes all or parts of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina, and Uvalde counties.  *See Barshop*, 925 S.W.2d at 624-25.

The Edwards Aquifer Authority is a conservation and reclamation district created by the legislature in 1993 and empowered to regulate groundwater withdrawals by well from the aquifer.  *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, §§ 1.02, 1.14, 1.41, 1993 Tex. Gen. Laws 2350, 2350-2372 (EAA Act); *see* Tex. Const. art. XVI, § 59(a).  Because this appeal concerns procedural requirements relating to the Authority's regulation of the aquifer, it is helpful first to examine these requirements—and various legal developments that ultimately delayed their implementation—in order to place the Authority's appellate issues in context.

---

[1]  The "chemical" reference in the company's name reflects the grade of lime it produces, not its use or creation of chemicals.  It makes lime by quarrying limestone, crushing it, and applying heat, using only limestone, a heat source, and water in this process.  The heat comes from a mixture of coal and petroleum coal, augmented by natural gas.

**The Edwards Aquifer Authority Act**

Among other limitations, the EAA Act imposed aquifer-wide limits on water withdrawals by non-exempt wells and empowered the Authority to allocate the caps among wells through a permit system.[2] EAA Act § 1.14(b), (c). The legislature gave "existing users" preference under the permit system. *See id*. § 1.16. "Existing users" were defined as persons who withdrew and beneficially used underground water from the aquifer on or before June 1, 1993. *Id*. § 1.03(10). "An existing user may apply for an initial regular permit by filing a declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972, through May 31, 1993." *Id*. § 1.16(a). The Authority was authorized initially to grant regular permits solely to existing users who properly filed a declaration of historical use and who established "by convincing evidence beneficial use of underground water from the aquifer." *Id*. § 1.16(d). Existing users were entitled to an amount of water equal to their maximum beneficial use of water during any one calendar year of the historical period unless the total amount of such maximums by all existing users in the aquifer exceeded 450,000 acre-feet per year through the year 2007 and 400,000 acre-feet per year thereafter. *Id*. §§ 1.14(b), (c), 1.16(e). If total maximum historical usage exceeded this level, the legislature required the Authority to reduce proportionately the amounts of withdrawals under the permits as necessary to meet the cap. *Id*. § 1.16(e). Conversely, to the extent that unallocated water within the cap remained after the issuance of permits to existing users who

---

[2] Wells producing no more than 25,000 gallons per day for domestic or livestock purposes were exempted from the caps and the permit system. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, §§ 1.16(c), 1.33, 1993 Tex. Gen. Laws 2350, 2361, 2366 (EAA Act).

properly applied, the Authority was authorized to issue additional regular permits, subject to the cap. *Id*. § 1.18(a).

As originally enacted, the EAA Act required existing users to file their "declaration of historical use" on or before March 1, 1994. *Id*. § 1.16(b). This date was exactly six months after the original effective date of the EAA Act, September 1, 1993. *See id*. § 4.02. Until the Authority actually began granting regular permits, existing users could continue to beneficially withdraw and beneficially use water, provided it was not wasted. *Id*. § 1.17.

**The *Barshop* litigation and other delays**

The EAA Act also provided that the Authority's board of directors would be appointed by various governing bodies affected by the Authority. *Id*. § 1.09. This appointment procedure was required to be submitted to the United States Department of Justice for administrative preclearance under section 5 of the Voting Rights Act. *See* 42 U.S.C.A. § 1973c (West 2003). The Department refused preclearance on the basis that the EAA Act contemplated appointive rather than elective selection of the Authority's board. This made the appointment provision unenforceable. *See id*. The legislature did not attempt to remedy the EAA Act's section 5 problem until its next regular session in 1995. Thus, the EAA Act's original September 1, 1993 effective date and its March 1, 1994 deadline for existing users to file declarations of historical use both passed during a period in which the EAA Act was made unenforceable by federal law.

In 1995, the legislature amended the EAA Act to change the board's selection method from appointment to election. Act of May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen.

Laws 2505, 2505-17 (amendments to the EAA Act).[3]  The legislature provided that these amendments would take effect on August 28, 1995, and the Department of Justice precleared the amended EAA.  *Id.* at 2517; *Barshop*, 925 S.W.2d at 625.  However, the legislature did not amend the EAA Act's original March 1, 1994 historical use declarations filing deadline or otherwise address how this expired deadline was to be adjusted.

Six days before the amendments to the EAA Act were to take effect, a local underground water conservation district, later joined by other local water districts and agricultural interests, brought a declaratory judgment action challenging the constitutionality of the EAA Act in the district court of Medina County.  The plaintiffs obtained a temporary restraining order and then a temporary injunction barring the Act's administration and enforcement, specifically prohibiting the promulgation of any new rules, setting of fees, receipt of any declarations or applications for permits, and "in any way carrying out the duties, rights, obligations or functions described in [the Act]."  The effective date of the EAA Act, as amended, passed while this injunctive relief remained in effect.  The district court ultimately rendered judgment declaring the EAA Act unconstitutional and permanently enjoining the State from implementing and enforcing it.  *Barshop*, 925 S.W.2d at 625.

The district court's judgment was appealed directly to the Texas Supreme Court. The defendants sought, but were denied supersedeas.  On June 28, 1996, the supreme court rendered judgment reversing the district court's judgment, declaring that the EAA Act was constitutional,

---

[3] We will hereafter refer to both the EAA Act and the amendments to the EAA Act collectively as the EAA Act except where necessary to distinguish specific amendments.

6

dissolving the district court's injunction, and remanding the cause to the district court for consideration of whether attorney's fees should be awarded to either party. *Id*. at 637-38.

The supreme court in *Barshop* rejected the plaintiffs' argument that the EAA Act effected an unconstitutional taking of existing users' property rights by imposing a then-impossible March 1, 1994 deadline to file the historical use declaration. *Id*. at 628. Eschewing a literal interpretation of the deadline provision, the supreme court construed it as merely "directory" rather than "mandatory." *Id*. at 628-30. The statutory deadline, in other words, merely manifested the broader legislative intent "that declarations of historical use [are] to be filed six months after the Authority becomes effective." *Id*. at 630. The court explained that the legislature "obviously intended that existing users would have preference over future users" and thus "provided existing users the opportunity to file their declarations with the Authority after the effective date of the Act but before allocation of water to other potential users." *Id*. at 629. Having construed the statutory deadline to provide existing users an opportunity to file historical use declarations, the supreme court held that the EAA Act did not effect a taking. *Id*. at 630.

The supreme court denied rehearing of its judgment on August 16, 1996. Its mandate did not issue until February 10, 1997.[4]

---

[4] In our initial opinion, we stated that the supreme court issued its mandate on August 31, 1996. We relied on an assertion in the Authority's comments to its proposed rules governing declarations of historical use, discussed below. The precise date of the mandate was irrelevant to our analysis because we held that the EAA Act became enforceable when the supreme court rendered judgment in *Barshop*. Because the precise date of the mandate is significant to our current analysis, we have verified the correct date with the supreme court.

7

**Response to *Barshop***

In the aftermath of the *Barshop* opinion and judgment, but before the supreme court's mandate issued, the Authority purported to begin its operations and promulgated rules setting forth the procedures governing the filing of declarations of historical use.[5] *See* 21 Tex. Reg. 11377, 11377-84 (1996) (codified at 31 Tex. Admin. Code §§ 701.1-.5, .11-.13, .15-.19, .21-.22) (adopted Nov. 22, 1996). The Authority published proposed rules on September 3, 1996, *id*. at 13784, and final rules on October 31, 1996, with an effective date of November 21, 1996. *Id*. The proposed rule set a deadline of December 28, 1996, a Saturday, for existing users to file their declarations of historical use. *Id*. at 11382. The Authority chose that date based on its interpretation of *Barshop*. *Id*. at 11378. It understood the supreme court to hold that the deadline for existing users to file declarations of historical use would be six months after the date the EAA Act had become "fully effective." *Id*. The Authority posited that the EAA Act had become effective on June 28, 1996, the same date the supreme court issued the *Barshop* opinion and judgment. It reasoned that the implementation of the amended EAA Act had been suspended by a district court injunction but that the "injunction was dissolved by the Texas Supreme Court on June 28, 1996, and the Act thereby became effective on that date." *Id*.

In response to comments, the Authority moved the deadline to December 30, the first Monday following the 28th, to address concerns that its offices otherwise would have been closed on the Saturday deadline. *Id*. at 11381. Foreshadowing the issues in this appeal, the Authority

---

[5] "A declaration is an application for initial regular permit, and is to be filed with the Authority in accordance with this chapter." 21 Tex. Reg. 11377, 11383 (1996) (codified at 31 Tex. Admin. Code § 701.12) (adopted Nov. 22, 1996).

rejected arguments that the deadline should be based not on the date the *Barshop* opinion was issued but on subsequent events in the appeal:

> A commentator contended that the filing date should be February 28, 1997, which is six months after the date the Texas Supreme Court issued its mandate on August 31, 1996 in *Barshop* . . . sending the case back to the trial court. The filing date stated in the rule is December 30, 1996, six months after the Texas Supreme Court dissolved the trial court injunction that had blocked the Act from taking effect. The staff adheres to the December date, because the Act became fully effective on June 28, 1996, when the injunction was dissolved. The dissolution of the injunction was immediately effective, and was not delayed by subsequent procedural steps in the Supreme Court. The staff recommends against adopting the February date because it is inconsistent with the Legislature's intent to require filing of declarations of historical use six months after the actual effective date of the Act. Adopting the later date would also expose those applicants who would file after December 30, 1996, to litigation attacking the filings as untimely.

*Id*.

**Chemical Lime files its permit application**

From at least 1992, the New Braunfels plant now owned by Chemical Lime had been reporting its monthly water usage to the Texas Natural Resource Conservation Commission (TNRCC).[6] In November 1996, John Kret, the plant manager, received by mail an "Application for Initial Regular Permit and Declaration of Historical Use" from the Authority. Kret gave the form to Jim Johnson, the plant manager, to complete and file with the Authority. Because Johnson thought that the information requested was similar to the information Chemical Lime had previously been required to file with the TNRCC, which was also due at the end of the year, Johnson decided

---

[6] Formerly, the Texas Water Board and currently the Texas Commission on Environmental Quality.

to fill out both forms at the same time. Only later did Johnson discern that the Authority was requesting twenty-one years of back data; the TNRCC required only one year of data. Johnson testified that, in mid-December 1996, he called the Authority to inquire if they needed "good" data or if he could provide estimates. He could not remember the name of the person with whom he spoke, but he claimed that he identified himself to an Authority employee, who informed him that the Authority needed actual data from all years in the twenty-one year period, not estimates.

Johnson then attempted to recover the data requested but was unable to find all the records for the years requested. Sometime between December 25 and December 30, he again called the Authority. He testified that he spoke with Gayle Kipp[7] and told her that he would not be able to submit a complete application by December 30 unless he was able to supply estimated data for some years. He testified that Kipp told him to "get it in when you get it—when you get that data on it." According to Kipp's testimony, Authority staff had instead been instructed that the applications could be submitted without complete water use data and that data could be filed after the deadline.[8] Johnson filed the application with the Authority on January 17, 1997. It was incomplete because he was not able to find data for all of the requested years.

_____

[7] Johnson could not remember Kipp's name. Kret reported that Johnson told him her name at the time. Kipp, an Authority employee, testified that she did not remember this conversation but she also could not deny that it could have happened.

[8] Rick Illgner, at the time acting general manager of the Authority, and Steven Walthour, a supervisory geologist with the Authority, also testified that applicants could supplement their applications after December 30. Walthour testified that the reason the Authority would allow supplements to applications was that it recognized that there was a short period of time for people to gather the necessary information. They both testified that the Authority would not consider new applications filed after December 30.

In February 1997, the Authority sent Chemical Lime a letter "acknowledg[ing] the receipt of your application for initial regular permit." It also stated that Chemical Lime's "application is administratively complete during the initial administrative review process." The Authority began processing applications sometime in March. Kipp conducted a field inspection of the New Braunfels facility in June. In December, the Authority advised Chemical Lime that it "preliminarily found that your application provides sufficient convincing evidence to substantiate your declaration of historical use." It determined an amount of Chemical Lime's "maximum beneficial use of water without waste" and stated that Authority staff "will be recommending that you receive a permit according to your application." In April 1998, the Authority notified Chemical Lime that "the technical review of the application was completed on 3/21/98," and, on April 24, it issued Chemical Lime an "Initial Regular Permit" to withdraw water from the Aquifer, "subject to final action of the Board of Directors of the Authority." Thus, Chemical Lime was still not yet entitled to begin withdrawing water under a permit. At the Authority's request, Chemical Lime provided further information in support of its application in May 2000.

In November 2000, the Authority rejected Chemical Lime's application, finding that its declaration of historical use was not filed timely (before December 30, 1996)[9] and that its historical withdrawals were not placed to a beneficial use for irrigation, municipal, or industrial use. Chemical Lime then filed its notice of protest in December. Several Chemical Lime employees met

---

[9] The Authority attributes its sudden reversal to its discovery, in 2000, of an error in its "coding" of Chemical Lime's application in its database. Because of this error, the application was not coded as having been filed after the December 30, 1996 deadline, and thus escaped notice. This error was not discovered until 2000.

11

with Walthour in January 2001 to discuss the rejection of the application. Walthour told them that they would need to schedule an "informal meeting," which was later set for October 2001. The Authority also sent Chemical Lime a letter in May, scheduling an "informal meeting" in October as "an opportunity to provide evidence to support their protest." The Authority staff attorney with whom they met in October stated that he did not have authority to make decisions concerning applications, and so another meeting was scheduled with Gregory Ellis, the General Manager of the Authority, for later in the month. At that meeting, Ellis requested more information in support of Chemical Lime's application, which Chemical Lime filed with the Authority in December 2001. In May 2002, Ellis rejected Chemical Lime's requests.

**Proceedings below**

Chemical Lime filed suit in district court seeking declarations that: (1) the Authority's rule establishing a December 30, 1996 filing deadline was invalid and that Chemical Lime's initial regular permit application was filed timely on January 17, 1997; (2) the EAA Act—specifically, the legislature's repeal of section 1.11(h) of the EAA Act, which had made the EAA subject to the Administrative Procedure Act—violated constitutional protections of due course of law, separation of powers, open courts and jury trial because it afforded inadequate judicial review of the Authority's determinations;[10] (3) the EAA's "unlawful actions" effected an unconstitutional taking; and (4) in the alternative, assuming that the EAA's December 30, 1996 filing deadline was valid, Chemical Lime had substantially complied with it. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011

[10] See Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d 618, 632-33 (Tex. 1996).

12

(West 1997 & Supp. 2004-05). The district court severed the takings claim. The deadline validity issue and remaining constitutional claims were tried to the district court on stipulated facts. The substantial-compliance issue was tried to a jury, which found in Chemical Lime's favor. The district court rendered judgment that the Authority's December 30, 1996 deadline was invalid and Chemical Lime's IRP application was timely filed. It held in the alternative that Chemical Lime had substantially complied with the application requirements and that "the Authority's denial of Chemical Lime's IRP application on the grounds that it was not timely is invalid, improper, and illegal." However, the district court rendered judgment that the legislature's repeal of section 1.11(h) did not violate the constitutional protections of due course of law, separation of powers, open courts, and jury trial. Finally, the district court awarded Chemical Lime attorney's fees and costs, and later made findings of fact and conclusions of law regarding this portion of the judgment. This appeal followed.

## DISCUSSION

The Authority presents four issues on appeal. It first contends that the district court erred in invalidating the Authority's rule setting a December 30, 1996 deadline for filing declarations of historical use. It urges that the effective date of the EAA Act was June 28, 1996, the date of the *Barshop* judgment, and that *Barshop* and the legislative intent underlying the EAA Act compelled the agency to set its deadline, December 30, the first business day following six months after June 28. The Authority next challenges the district court's alternative holding that Chemical Lime substantially complied with a December 30 deadline. In its second issue, the Authority contends that, as a matter of law, a party cannot be in "substantial compliance" with a filing deadline when

13

there is no dispute that the party failed to file any portion of the filing until after that deadline. Predicated on this argument, the Authority asserts in its third issue that there is no evidence that Chemical Lime substantially complied with the December 30, 1996 deadline.

In its fourth issue, the Authority presents two arguments challenging the district court's award of attorney's fees. It begins with the assertion that Chemical Lime cannot recover attorney's fees under the UDJA because the water code provides Chemical Lime with its exclusive remedies and does not provide for attorney's fees. *See* Tex. Water Code Ann. §§ 36.251-.254 (West 2000); *Hageman v. Luth*, 150 S.W.3d 617, 627 (Tex. App.—Austin 2004, no pet.); *Strayhorn v. Raytheon E-Sys., Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied); *Young Chevrolet v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied). Second, the Authority asserts that, if it prevails on the merits of its first three issues, an award of attorney's fees to the Authority is mandatory. *See* Tex. Water Code Ann. § 36.066(g) (West Supp. 2005).

**_Barshop_ and the deadline for filing a declaration of historical use**

In its first issue, the Authority asserts that its December 30, 1996 historical use declaration filing deadline is authorized under the EAA Act, as construed in *Barshop*. This issue presents pure questions of law, which we review *de novo*.[11] *See In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004); *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994).

---

[11] In its briefing, the Authority contended that its choice of the December 30, 1996 deadline is entitled to deference. It abandoned this position at oral argument, however, conceding that our standard of review regarding this issue is *de novo*.

14

The Authority's argument rests upon two subsidiary propositions. First, the Authority interprets *Barshop* to hold that the historical use declaration filing deadline is six months after the EAA Act became enforceable.[12] Second, the Authority contends that the EAA Act became enforceable on June 28, 1996, at the moment when the supreme court issued its *Barshop* opinion and judgment. Therefore, the Authority concludes, its rule setting a filing deadline of December 30,

---

[12] Both parties (and even the supreme court in *Barshop*) refer interchangeably to the EAA's "effective date" and the date the Act became enforceable, perhaps implying that the effective date was postponed by the section 5 preclearance problems and the *Barshop* injunction. That did not occur in a literal sense. The EAA Act took effect on the date the legislature specified—only its implementation and enforcement were delayed by intervening legal developments. Specifically, the EAA Act originally took effect in 1993, but its implementation and enforcement were barred by section 5 of the Voting Rights Act. *See* 42 U.S.C.A. § 1973c (West 2003). Subsequently, the legislature amended the EAA Act to address the preclearance issues and made this new version effective on August 28, 1995. Act of May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen. Laws 2505, 2517. Prior to that date, the *Barshop* district court temporarily restrained and enjoined the implementation and enforcement of the amended EAA Act. The amended EAA Act took effect while this injunction remained in effect. The district court later rendered judgment declaring the Act unconstitutional and permanently enjoining its implementation and enforcement. *See Barshop*, 925 S.W.2d at 625. The district court denied supersedeas and this judgment remained in effect while the direct appeal was pending.

The section 5 delays and the district court's injunctive relief did not change the date the legislature specified for the EAA Act to take effect, but merely barred the Act's enforcement once it took effect. *See Texas Highway Comm'n v. West Tex. Drilling, Inc.*, 366 S.W.2d 242, 244 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) (injunction prevents enforcement of statute); *see also* Tex. Const. art. I, § 28 (suspension of law only within power of legislature); 42 U.S.C.A. § 1973c. Similarly, the district court's final judgment declaring the EAA Act unconstitutional did not impact the Act's effective date, but instead placed outside the powers of government (*i.e.*, rendered void) its enforcement. Tex. Const. art. I, § 29; *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148-49 (Tex. 1995).

Considering this context, we believe that the supreme court in *Barshop* used such terms as "effective date" and "date the Authority becomes effective" not in their literal sense but as shorthand references to the date on which the legal impediments to the EAA Act's implementation and enforcement were finally removed. We construe the parties' arguments accordingly.

15

1996 is within its statutory powers,[13] and Chemical Lime's January 17, 1997 filing is untimely as a matter of law.

Chemical Lime disputes that the EAA Act took effect immediately upon the supreme court's judgment in *Barshop*. Chemical Lime argued in its brief that the EAA Act did not become effective until at least August 16, 1996, the date the supreme court denied rehearing in *Barshop*, because the court's judgment was not final until that date. During oral argument, Chemical Lime suggested that the date the supreme court issued its mandate in *Barshop*—February 10, 1997—might also control. Six months after these dates would have been February 16, 1997, or August 10, respectively, making the Authority's rule invalid.

Assuming that the EAA Act did become enforceable on June 28, 1996, Chemical Lime questions whether *Barshop* mandated a historical use declaration filing deadline of six months thereafter, suggesting that the correct deadline intended by the legislature and the *Barshop* court was six months after the Authority had implemented its rules governing these filings and thereby actually became capable of accepting them. While requiring existing users to file historical use declarations, the EAA Act was silent concerning the procedures governing these filings or what they must contain; rather, the legislature mandated that the Authority would promulgate forms detailing the information

---

[13] The parties do not dispute that the code construction act's method of counting months governs here. *See* Tex. Gov't. Code Ann. § 311.014(c) (West 2005). Under this method, if the number of months is to be computed by counting the number of months from a specific day, the period ends on the same numerical day in the concluding month as the day of the month from which the computation began. *Id*. Also, if the last day of a period ends on a Saturday, Sunday, or legal holiday, the period is extended to the next day that is not a Saturday, Sunday, or legal holiday. *Id*. § 311.014(b). Here, because the six-month period expired on December 28, 1996, a Saturday, the Authority extended the deadline to the following Monday, December 30.

that would be required and set any filing fees. EAA Act § 1.16(b). The Authority did not promulgate proposed rules delineating these requirements until September 3, 1996, and these rules did not take effect until November 21, 1996. If these dates were when the Authority "became effective" under *Barshop*, the Act's filing deadline would have been May 21, 1997, or March 3 at the earliest, and the Authority's rule setting an earlier deadline would have been invalid.

We conclude that the EAA Act did not "become effective," as the supreme court contemplated in *Barshop*, until the court's mandate issued on February 10, 1997.

In our original opinion, we concluded that the EAA Act became enforceable on June 28, 1996, when the supreme court issued its *Barshop* opinion and judgment. We relied on authorities establishing that a party cannot execute or enforce a lower court judgment after an appellate court reverses it, regardless of whether the appellate court's judgment is final or its mandate has issued. *Flanary v. Wade*, 113 S.W. 8, 10 (Tex. 1908); *Humble Exploration Co. v. Walker*, 641 S.W.2d 941, 943 (Tex. App.—Dallas 1982, orig. proceeding) (appellate court order vacating receivership operated instantly; therefore, trial court was without jurisdiction to continue receivership); *see also In re Bohart*, 743 F.2d 313, 319-21 (5th Cir. 1984). These authorities would be dispositive if, as we assumed in our original opinion, our sole concern was when the *Barshop* district court's injunction ceased to be enforceable by contempt. As Chemical Lime has convinced us on rehearing, the issue is more complex.

The *Barshop* district court's judgment contained not only an injunction barring the EAA Act's implementation and enforcement, but also a declaration that the EAA Act was unconstitutional. The district court refused supersedeas and its judgment remained in effect pending

17

direct appeal to the supreme court. On June 28, 1996, the supreme court rendered its opinion and judgment reversing the district court, dissolving the injunction, and declaring the constitutionality of the EAA Act. From that time forward, the district court could not enforce its injunction with contempt power, *see Flanary*, 113 S.W. at 10; *Humble Exploration Co.*, 641 S.W.2d at 943; *In re Bohart*, 743 F.2d at 319-20, but this does not mean that the supreme court's judgment declaring the EAA Act constitutional and reversing the district court's contrary declaration also became effective at that time.

The supreme court has emphasized the significance of the mandate in determining when an appellate court judgment becomes enforceable in a lower court. The mandate is the formal command from an appellate court commanding the lower court to comply with the appellate court's judgment. *See* Tex. R. App. P. 51.1(b), 65.2; *In re Grossnickle*, 115 S.W.3d 238, 243 (Tex. App.—Texarkana 2003, orig. proceeding); *Lewelling v. Bosworth*, 840 S.W.2d 640, 642-43 (Tex. App.—Dallas 1992, orig. proceeding); *Dixie Gas & Fuel Co. v. Jacobs*, 66 S.W.2d 446, 448 (Tex. Civ. App.—Beaumont 1933, writ dism'd w.o.j.) (citing *Black v. Epperson*, 40 Tex. 162, 172-73 (Tex. 1874)). An appellate court judgment is not enforceable in the lower court before mandate issues. *See In re Long*, 984 S.W.2d 623, 625-26 (Tex. 1999); *see also* Stacy Obenhaus, *It Ain't Over 'Til It's Over: The Appellate Mandate in Texas Courts*, 15 The Appellate Advocate: State Bar of Texas Appellate Section Report 4, 5-8 (2003). In *Long*, for example, the district clerk had been enjoined by the district court from collecting certain filing fees and appealed that injunction. *Long*, 984 S.W.2d at 624. The district court later found the clerk in contempt for violating the injunction and issued fines, and the clerk appealed. *Id*. The supreme court noted that the clerk's original notice

of appeal had functioned as a supersedeas bond. *Id*. at 626. It then held that "the Clerk could not be held in contempt for violating the injunction until all appeals relating to the judgment were exhausted and a mandate enforcing the injunction was issued." *Id*.; *see also Saudi v. Brieven*, 176 S.W.3d 108, 116-17 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

Ordinarily, the mandate issues only after the appellate court's judgment becomes final. *See generally* Tex. R. App. P. 18.1. In the supreme court, for example, mandate issues after the expiration of ten days following the deadline to file a motion to extend time to file a motion for rehearing, if no extension or rehearing motion is timely filed. *Id*. 18.1(b). This period serves to afford the court and parties the opportunity to correct an appellate judgment before commanding its execution and enforcement in the lower court.[14] But the mandate may issue earlier in certain circumstances. In accelerated appeals, the appellate court may issue the mandate with the judgment.

_____

[14] As one commentator put it:

> In considering the delay that the appellate mandate builds into the appellate process, one might think in terms of the art of baking. When one removes a hot cake fresh from the oven, one has to let it cool a bit before cutting and frosting it—else it may be ruined—and one may even need to return that cake to the oven after probing it and determining that it's not quite done yet. By analogy, the delay in the issuance of the mandate allows the parties to assess the court's work product, to test it, and perhaps even to correct it before the final *oeuvre* is placed on the table for consumption. Such an intent is apparent from the time limits contained in the appellate rules, whereby the mandate doesn't issue until a considerable period of time after the date the court issues its judgment or after the overruling of a timely motion for rehearing. If the appellate clerk complies with those time limits and waits the allotted time . . . the mandate will not issue until a party has forgone the opportunity to file a petition for review in a civil case . . . .

Stacy Obenhaus, *It Ain't Over 'Til It's Over: The Appellate Mandate in Texas Courts*, 15 The Appellate Advocate: State Bar of Texas Appellate Section Report 4, 8 (2003).

Tex. R. App. P. 18.6. The mandate may also issue earlier if the parties so agree "or for good cause on the motion of a party." *Id.* 18.1(c). The State did not seek to expedite the *Barshop* mandate either while rehearing was pending or during the almost seven months thereafter before it finally issued.

In our initial opinion, we distinguished *Long* and the significant role of the mandate on the basis that "we are not concerned with the enforceability of an appellate judgment in the trial court . . . but with the enforceability of a lower court judgment once an appellate court reverses it." We are now persuaded that, in fact, we are concerned with both. Although the *Barshop* district court's judgment ceased to be capable of enforcement by injunction and contempt once the supreme court rendered judgment reversing it, the district court's underlying, unsuperseded judgment declaring the EAA Act unconstitutional remained pending until the supreme court issued its mandate commanding enforcement of its judgment reversing that declaration.

We express no opinion regarding the legal status or validity of acts performed under color of the EAA Act between the June 28, 1996 supreme court judgment in *Barshop* and the court's issuance of its mandate. We hold only that, for purposes of determining the EAA Act's deadline for filing historical use declarations under that statute and *Barshop*, the Act cannot be considered to have "become effective" until February 10, 1997, when the supreme court's mandate issued in *Barshop*. That is the first date on which all legal impediments to the EAA Act's enforceability were finally removed and is the closest analog to the EAA Act's original effective date. *See Barshop*, 925 S.W.2d at 629-30.

20

Six months after February 10, 1997, was August 10, 1997. By setting a December 30, 1996 filing deadline, the Authority exceeded its statutory powers, and we hold that its rule is invalid.

We also hold that Chemical Lime's January 17, 1997 declaration was timely filed as a matter of law. While Chemical Lime's filing and the Authority's rules governing historical use declarations both preceded the date the EAA Act "became effective," we believe this made the filing and rules premature, but not void.[15] In effect, the EAA Act, the Authority, the rules governing historical use declaration filings, and Chemical Lime's filing all became fully effective on February 10, 1997. This also renders irrelevant the distinction Chemical Lime urges between the date the EAA Act became enforceable and the date the Authority actually became capable of accepting historical use declarations.

We overrule the Authority's first issue. Because this holding alone supports the district court's judgment, we do not reach the Authority's issues concerning the district court's alternative "substantial compliance" grounds.

---

[15] We note that the Authority's predecessor entity, the Edwards Underground Water District, continued in effect until the EAA Act and Authority became effective, whereupon rules adopted by the Edwards Underground Water District became rules of the Authority until amended or repealed. *See* EAA Act § 1.41(e); *see also id.* § 1.41(c) (when Act took effect all of District's real and personal property, leases, rights, contracts, staff, and obligations were transferred to Authority), (d) (when Act took effect all of District's unobligated, unexpended funds were transferred to Authority), (f) (upon Act's effective date, Authority was automatically substituted for District in any judicial or administrative proceeding to which District was party).

21

**Attorney's fees**

The district court awarded attorney's fees under the Uniform Declaratory Judgments Act (UDJA) because Chemical Lime was the prevailing party and because it found that such award was reasonable and just. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 1997). In its fourth issue, the Authority presents two challenges to the district court's award. First, the Authority argues that Chemical Lime could not recover attorney's fees under the UDJA because a declaratory judgment action was not a proper vehicle for bringing its claims. Instead, it contends that the water code provides the sole remedy and that the water code does not support an award of attorney's fees to Chemical Lime. Second, the Authority urges that, as the prevailing party, an award of attorney's fees to it is now mandatory under the water code. *See* Tex. Water Code Ann. § 36.066(g). Because we hold that Chemical Lime is the prevailing party, we reject the Authority's second argument and need consider only whether Chemical Lime is limited to the remedies in the water code.

Attorney's fees are recoverable only when provided for by statute or by the parties' agreement. *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992). In this case, the dispute centers on which statutory provision, the UDJA or water code section 36.066 controls. Statutory construction matters present questions of law that we review *de novo*. *Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002). In construing a statute, our objective is to determine and give effect to the legislature's intent. *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004); *see also* Tex. Gov't Code Ann. § 312.005 (West 2005). If the statutory text is unambiguous, we "must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results."

*Mega Child Care, Inc.*, 145 S.W.3d at 177. Legislative intent is derived from the entire act, not just its isolated portions. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

Generally, a party proceeding under the UDJA may recover its attorney's fees. Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The grant or denial of attorney's fees under the UDJA is within the district court's discretion, and its order will not be reversed on appeal absent a clear showing that the court abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985); *Del Valle Indep. Sch. Dist. v. Lopez*, 863 S.W.2d 507, 513 (Tex. App.—Austin 1993, writ denied). The legal principle encompassed in the term "abuse of discretion" concerns a legal error committed by the district court in its award of attorney's fees that injured or prejudiced appellants. *Lopez*, 863 S.W.2d at 513. We review a question of legal error *de novo*. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 314 (Tex. App.—Austin 1997, pet. denied).

It is an abuse of discretion to award attorney's fees under the UDJA when the relief sought is no greater than relief that otherwise exists by agreement or statute. *See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc.*, 31 S.W.3d 750, 753 (Tex. App.—Austin 2000, pet. dism'd by agr.); *University of Tex. v. Ables*, 914 S.W.2d 712, 717 (Tex. App.—Austin 1996, no writ). To establish jurisdiction under the UDJA, a party must plead the existence of an "underlying controversy" within the scope of section 37.004 of the civil practice and remedies code. *See Kadish v. Pennington Assocs., L.P.*, 948 S.W.2d 301, 304 (Tex. App.—Houston [1st Dist.] 1995, no writ). When a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant remedies. *Beacon*

23

*Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.—Austin 2002, no pet.) (citing *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied)). "There is no basis for declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a judicial declaration would add nothing to what would be implicit or express in a final judgment for the enforceable remedy." *Universal Printing Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). It is an abuse of discretion, therefore, to award attorney's fees under the UDJA when the statute is relied upon solely as a vehicle to recover attorney's fees. *Texas State Bd. of Plumbing Exam'rs*, 31 S.W.3d at 753.

We first consider whether Chemical Lime's challenge to the Authority's rules is an action that must be brought under chapter 36 of the water code. The legislature specifically permitted suits against a water district under chapter 36 of the water code. *See* Tex. Water Code Ann. § 36.066(a). Section 36.251 states that

> A person, firm, corporation, or association of persons affected by and dissatisfied with any provision or with any rule or order made by a district is entitled to file a suit against the district or its directors to challenge the validity of the law, rule, or order. The suit shall be filed in a court of competent jurisdiction in any county in which the district or any part of the district is located. The suit may only be filed after all administrative appeals to the district are final.

*See id.* § 36.251 (West 2000). Section 36.254 clarifies that the remedies available under chapter 36 "do not affect other legal or equitable remedies that may be available." *Id.* § 36.254 (West 2000). Thus, the claimant's remedies under chapter 36 are cumulative, not exclusive, and the chapter does

24

not bar Chemical Lime from pursuing declaratory relief, including attorney's fees, under the UDJA. *See id.*

Furthermore, the remedies Chemical Lime sought under the UDJA were not redundant because in 2001 section 1.11(h) of the EAA Act—which had made the EAA subject to the Administrative Procedure Act—was repealed. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, § 1.11(h), 1993 Tex. Gen. Laws 2350, 2359, *repealed by* Act of May 27, 2001, 77th Leg., R.S., ch. 966, § 6.03, 2001 Tex. Gen. Laws 1991, 2075; *see also Barshop*, 925 S.W.2d at 632-33 (noting that former § 1.11(h) of the EAA Act provided for judicial review of Authority's decisions). Thus, when Chemical Lime filed its suit in 2002, it did not have the option of asserting its claim under the Administrative Procedure Act.[16] *See* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2000 & Supp. 2005).

Additionally, the supreme court has stated that private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority. *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *see also Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 445 (Tex. 1994) (declaratory judgment suit challenging state officials' construction of compulsory school-attendance law as applicable to home-schooled children). Here, the district court had jurisdiction to consider Chemical Lime's constitutional claims and its challenge to the validity of the deadline imposed by the Authority's rule interpreting the EAA Act. *See IT-Davy*, 74 S.W.3d at 855; *see also Leeper*, 893 S.W.2d at 445.

---

[16] The repeal of section 1.11(h) of the EAA Act was the basis for Chemical Lime's claims that the Act afforded inadequate judicial review of the Authority's determinations and violated constitutional protections of due course of law, separation of powers, open courts, and jury trial. Chemical Lime does not appeal the district court's adverse judgment on these claims.

Because section 36.254 of the water code does not foreclose the availability of "other legal or equitable remedies that may be available," and because the remedies sought were not redundant, the district court did not abuse its discretion in awarding attorney's fees under the UDJA to Chemical Lime. *See* Tex. Water Code Ann. § 36.254; Tex. Civ. Prac. & Rem. Code Ann. § 37.009. We overrule the Authority's fourth issue.

## CONCLUSION

We affirm the district court's judgment invalidating the Authority's filing deadline, declaring Chemical Lime's historical use declaration to be timely filed, and awarding attorney's fees.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:   September 14, 2006

26