**EDWARDS AQUIFER AUTHORITY
et al., Petitioners,**

v.

**CHEMICAL LIME, LTD., Respondent.**

No. 06–0911.

Supreme Court of Texas.

Argued April 1, 2008.

Decided June 26, 2009.

Rehearing Denied Sept. 25, 2009.

Mike A. Hatchell, Locke Lord Bissell & Liddell, LLP, Andrew S. Miller, Darcy Alan Frownfelter, Kemp Smith, P.C., Austin, TX, Ken Slavin, Mark N. Osborn, Deborah Clarke Trejo, Kemp Smith, LLP, El Paso, TX, for Petitioner.

William John Moltz, Janessa Coffman Glenn, Moltz Morton O'Toole, L.L.P., Thomas R. Phillips, Baker Botts L.L.P., Austin, TX, Robert B. Gilbreath, Hawkins, Parnell & Thackston, LLP, Paul C. Watler, Jackson Walker, L.L.P., Alisa Marie Framè, Baker Botts L.L.P., Dallas, TX, for Respondent.

Amy Warr, Alexander Dubose & Townsend, LLP, Kristofer S. Monson, Asst. Solicitor General, Julie A. Ford, R. James George Jr., George & Brothers LLP, Austin, TX, for Amicus Curiae.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice MEDINA, Justice GREEN, Justice JOHNSON and Justice WILLETT joined.

Whether, as a general matter, an appellate court's decision takes effect the moment the court issues its opinion, order, or judgment, or later when rehearing is denied or the time for rehearing expires, or still later when the clerk issues the mandate, is a difficult question under Texas law and procedure, as reflected by the competing arguments in JUSTICE BRISTER's and JUSTICE WILLETT's separate opinions, and one we need not answer today. We all agree that if an appellate court expressly states the time for its decision to take effect, that statement controls. That rule applies here.

In *Barshop v. Medina County Underground Water Conservation District*, we prescribed a filing deadline "six months after the [Edwards Aquifer] Authority becomes effective".[1] As it happened, the Authority began operations the day we issued our opinion and thus became effective. The deadline was set at six months

---

1. 925 S.W.2d 618, 630 (Tex.1996).

from that date. We hold that the Authority correctly applied *Barshop*, and therefore we reverse the judgment of the court of appeals.[2] We remand the case to the trial court for further proceedings.

## I

The Edwards Aquifer is an underground layer of porous, water-bearing rock, 300–700 feet thick, and five to forty miles wide at the surface, that stretches in an arced curve from Brackettville, 120 miles west of San Antonio, to Austin. It is the primary source of water for south central Texas and therefore vital to the residents, industry, and ecology of the region, the State's economy, and the public welfare.

Record droughts in the early 1950s prompted the Legislature to create the Edwards Underground Water District in 1959 [3] "for the purpose of conserving, protecting and recharging the [aquifer's] underground water-bearing formations … and for the prevention of waste and pollution".[4] Although the District's powers were broadened over the years, it still lacked the regulatory authority the Legislature came to believe was essential. In 1993, the Legislature passed the Edwards Aquifer Authority Act (EAAA),[5] which replaced the District with the Edwards Aquifer Authority, giving the Authority broad powers "for the effective control of the resource to protect terrestrial and aquatic life, domestic and municipal water supplies, the operation of existing industries, and the economic development of the state."[6] The EAAA also expanded the covered territory.

The EAAA prohibits withdrawals of water from the aquifer without a permit issued by the Authority,[7] limits the total

2. 212 S.W.3d 683 (Tex.App.-Austin 2006) (op. on reh'g).

3. *See* House Research Org., Bill Analysis, Tex. S.B. 1477, 73rd Leg., R.S. (1993) ("From 1950–1956, Texas experienced a record draught [sic], causing Comal Springs in New Braunfels to go dry for five months and reducing the flow of San Marcos Springs…. In response, the Edwards Underground Water District (EUWD) was legislatively created in 1959 to conserve, protect and recharge the groundwater in the five counties known as the Edwards Aquifer region.").

4. Act of April 9, 1959, 56th Leg., R.S., ch. 99, § 1, 1959 Tex. Gen. Laws 173, 173, *as amended by* Act of Apr. 12, 1979, 66th Leg., R.S., ch. 69, 1979 Tex. Gen. Laws 110; Act of May 23, 1979, 66th Leg., ch. 306, 1979 Tex. Gen. Laws 706; Act of May 19, 1983, 68th Leg., R.S., ch. 1010, 1983 Tex. Gen. Laws 5422; Act of May 29, 1987, 70th Leg., R.S., ch. 332, 1987 Tex. Gen. Laws 1746; Act of May 29, 1987, 70th Leg., R.S., ch. 333, 1987 Tex. Gen. Laws 1747; Act of May 26, 1987, 70th Leg., R.S., ch. 629, 1987 Tex. Gen. Laws 2411; Act of May 28, 1987, 70th Leg., R.S., ch. 652, 1987 Tex. Gen. Laws 2457; Act of May 29, 1989, 71st Leg., R.S., ch. 599, 1989 Tex. Gen. Laws 1988; *repealed by* Act of May 30, 1993, 73rd Leg., R.S., ch. 626, § 1.41(a), 1993 Tex. Gen. Laws 2350, 2368.

5. Act of. May 30, 1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 2350, *as amended by* Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505; Act of May 6, 1999, 76th Leg., R.S., ch. 163, 1999 Tex. Gen. Laws 634; Act of May 27, 2001, 77th Leg., R.S., ch. 966, §§ 2.60–.62, 6.01–.05, 2001 Tex. Gen. Laws 1991, 2021–2022, 2075–2076; Act of May 25, 2001, 77th Leg., R.S., ch. 1192, 2001 Tex. Gen. Laws 2696; Act of June 1, 2003, 78th Leg., R.S., ch. 1112, § 6.01(4), 2003 Tex. Gen. Laws 3188, 3193; Act of May 23, 2007, 80th Leg., R.S., ch. 510, 2007 Tex. Gen. Laws 900; Act of May 28, 2007, 80th Leg., R.S., ch. 1351, §§ 2.01–2.12, 2007 Tex. Gen Laws 4612, 4627–34; Act of May 28, 2007, 80th Leg. R.S., ch. 1430, §§ 12.01–12.12, 2007 Tex. Gen. Laws 5848, 5901–09; Act of May 21, 2009, 81st Leg., R.S., ch. ——, 2009 Tex. Gen. Laws —— (Tex. H.B. 4762, to become effective Sept. 1, 2009).

6. EAAA § 1.01.

7. EAAA § 1.15(b) ("Except as provided by Sections 1.17 ['Interim Authorization'] and 1.33 [wells producing less than 25,000 gallons

permitted withdrawals per calendar year,[8] and gives preference to "existing user[s]"—defined as persons who "withdr[ew] and beneficially used underground water from the aquifer on or before June 1, 1993."[9] With few exceptions, water may not be withdrawn from the aquifer through wells drilled after June 1, 1993.[10] A permit applicant must file with the Authority on a prescribed form[11] a "declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972, through May 31, 1993."[12] Subject to

the limit on total withdrawals of water from the aquifer, an existing user who files a declaration "as required", pays an application fee (set at $25), and "establishes by convincing evidence beneficial use of underground water from the aquifer"[13] is entitled to "a permit for withdrawal of an amount of water equal to the user's maximum beneficial use of water without waste during any one calendar year of the historical period."[14] After existing users' applications have been processed, the Authority may issue additional permits up to the cap on total annual withdrawals.[15] The Au-

per day for domestic or livestock use] of this article, a person may not withdraw water from the aquifer or begin construction of a well or other works designed for the withdrawal of water from the aquifer without obtaining a permit from the authority."); EAAA § 1.35(a) ("A person may not withdraw water from the aquifer except as authorized by a permit issued by the authority or by this article.").

8. Initially, the EAAA only capped withdrawals. EAAA § 1.14(b) (stating that, with certain exceptions, "for the period ending December 31, 2007, the amount of permitted withdrawals from the aquifer may not exceed 450,000 acre-feet of water for each calendar year"), *repealed by* Act of May 28, 2007, 80th Leg., R.S., ch. 1351, § 2.09, 2007 Tex. Gen. Laws 4612, 4634, *and by* Act of May 28, 2007, 80th Leg., R.S., ch. 1430, § 12.09, 2007 Tex. Gen. Laws 5848, 5908. The EAAA now sets both the maximum and minimum withdrawals permitted per calendar year. Act of May 28, 2007, 80th Leg., R.S., ch. 1351, § 2.02, 2007 Tex. Gen. Laws 4612, 4627 (amending EAAA § 1.14(c) to state that, with certain exceptions, "for the period beginning January 1, 2008, the amount of permitted withdrawals from the aquifer may not exceed or be less than 572,000 acre-feet of water for each calendar year, which is the sum of all regular permits issued or for which an application was filed and issuance was pending action by the authority as of January 1, 2005"); Act of May 28, 2007, 80th Leg., R.S., ch. 1430, § 12.02, 2007 Tex. Gen. Laws 5848, 5902 (same).

9. EAAA § 1.03(10).

10. EAAA § 1.14(e) ("The authority may not allow withdrawals from the aquifer through wells drilled after June 1, 1993, except additional water as provided by Subsection (d) and then on an interruptible basis."), *amended by* Act of May 28, 2007, 80th Leg., R.S., ch. 1351, § 2.02, 2007 Tex. Gen. Laws 4612, 4627 (amending EAAA § 1.14(e) to state: "The authority may not allow withdrawals from the aquifer through wells drilled after June 1, 1993, except for replacement, test, or exempt wells or to the extent that the authority approves an amendment to an initial regular permit to authorize a change in the point of withdrawal under that permit."), *and by* Act of May 28, 2007, 80th Leg., R.S., ch. 1430, § 12.02, 2007 Tex. Gen. Laws 5848, 5902 (same).

11. EAAA § 1.16(b).

12. EAAA § 1.16(a).

13. EAAA § 1.16(d).

14. EAAA § 1.16(e).

15. EAAA § 1.18 states: "(a) To the extent water is available for permitting after the issuance of permits to existing users, the authority may issue additional regular permits, subject to limits on the total amount of permitted withdrawals determined under Section 1.14 of this article. (b) The authority may not consider or take action on an application relating to a proposed or existing well of which there is no evidence of actual beneficial use before June 1, 1993, until a final determination has been made on all initial regular per-

thority's board of directors is required to "adopt rules necessary to carry out the authority's powers and duties ..., including rules governing procedures of the board and authority." [16]

The EAAA was enacted May 30, 1993. The Authority was to commence operations September 1, 1993, the general effective date of the statute, but the new regulatory scheme was to be phased in over six months.[17] Existing users had until March 1, 1994, to file permit applications,[18] at which point the permit requirement would take effect. After March 1, a filer could generally continue to withdraw water pending approval of its application.[19]

But implementation of the EAAA was delayed. Prior to September 1, 1993, the United States Department of Justice refused administrative preclearance for the new Authority under section 5 of the Voting Rights Act of 1965.[20] On May 29, 1995, the Legislature amended the EAAA to meet the Department's objections, and the Department granted preclearance. The amended statute was to be effective August 28, 1995,[21] but on August 22, a group of landowners and others sued for a declaration that the EAAA was facially unconstitutional. The district court issued a temporary restraining order the same day prohibiting the Authority from beginning operations. On November 27, 1995, the district court rendered judgment declaring the EAAA unconstitutional and permanently enjoining implementation of its provisions. But on direct appeal, this Court in *Barshop v. Medina County Underground Water Conservation District* held that the EAAA was not unconstitutional on its face and therefore reversed the district court's judgment, dissolved the injunction, and remanded the case to determine whether attorney fees should be awarded.[22] We issued our opinion and judgment on June 28, 1996, denied rehearing on August 16, 1996, and issued our mandate on February 10, 1997.

The Authority began operations the day our opinion issued, taking over all the assets, offices, personnel, and papers of the District,[23] which had continued in exis-

---

mit applications submitted on or before the initial application date of March 1, 1994."

**16.** EAAA § 1.11(a).

**17.** Act of May 30, 1993, 73d Leg., R.S., ch. 626, § 4.02, 1993 Tex. Gen. Laws 2350, 2371 ("This Act takes effect September 1, 1993, except Section 1.35 of Article 1 takes effect March 1, 1994.").

**18.** EAAA § 1.16(b) ("An existing user's declaration of historical use must be filed on or before March 1, 1994, on a form prescribed by the board. An applicant for a permit must timely pay all application fees required by the board.").

**19.** EAAA § 1.17.

**20.** *See* 42 U.S.C. § 1973c(a). The District's governing board consisted of fifteen elected directors. Act of April 9, 1959, 56th Leg., R.S., ch. 99, § 5, 1959 Tex. Gen. Laws 173, 175. The Authority's governing board con-

sisted of nine appointed directors. EAAA § 1.09.

**21.** Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505; *see also* TEX. CONST. art. III, § 39 ("No law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless the Legislature shall, by a vote of two-thirds of all the members elected to each House, otherwise direct....").

**22.** 925 S.W.2d 618, 637–638 (Tex.1996).

**23.** EAAA § 1.41 states in part: "(b) All files and records of the Edwards Underground Water District pertaining to control, management, and operation of the district are transferred from the Edwards Underground Water District to the authority on the effective date of this article. (c) All real and personal property, leases, rights, contracts, staff, and obli-

tence. A temporary board of directors appointed by the Legislature governed the Authority pending a November election.[24] The Authority's activities were widely reported in the media because of severe drought conditions existing in south central Texas,[25] diverse interests competing for permits,[26] and a lawsuit filed by the Sierra Club in June 1996 in the United States District Court for the Western District of Texas, seeking federal judicial management of the Edwards Aquifer to protect endangered species. On August 23, 1996, the federal court, convinced that it was facing an emergency, issued a preliminary injunction imposing a plan to manage the aquifer. The United States Court of Appeals for the Fifth Circuit stayed the injunction and later reversed it on the ground that the federal court should have abstained to allow the Authority, which was "in the process of taking comments and formulating rules for permits and emergency measures", time to function.[27]

The EAAA directed the temporary board to "adopt rules governing the authority" "as soon as practicable."[28] On August 31, 1996, the Authority issued proposed rules to govern the process for filing a permit application, including a declaration of historical use.[29] The Authority set Saturday, December 28, 1996—six months from the date of our *Barshop* opinion—as

gations of the Edwards Underground Water District are transferred to the authority on the effective date of this article. (d) On September 1, 1993, all unobligated and unexpended funds of the Edwards Underground Water District shall be transferred to the authority."

24. EAAA § 1.092(a) ("Until a board is elected as provided by this section and takes office, the authority is governed by a temporary board that consists of: (1) Mr. Phil Barshop; (2) Mr. Ralph Zendejas; (3) Mr. Mike Beldon; (4) Ms. Rosa Maria Gonzales; (5) Mr. John Sanders; (6) Ms. Sylvia Ruiz Mendelsohn; (7) Mr. Joe Bernal; (8) Mr. Oliver R. Martin; (9) Mr. A.O. Gilliam; (10) Mr. Bruce Gilleland; (11) Mr. Rogelio Munoz; (12) Mr. Doug Miller; (13) Ms. Paula DiFonzo; (14) Mr. Mack Martinez; (15) Ms. Jane Houghson; (16) one temporary director appointed by the South Central Texas Water Advisory Committee from among the members of the committee; and (17) one temporary director appointed jointly by the Commissioners Courts of Medina County and Uvalde County who must be a resident of one of those counties.").

25. *See, e.g.*, Tom Dukes, *Water Use from Edwards Aquifer Must Be Cut*, DALLAS MORNING NEWS, July 14, 1996, at J6 ("Pumping too much water from the Edwards during the current drought threatens the aquifer's water quality as well as the amount of water available."); Editorial, *Aquifer Pumping Rules*, AUSTIN AM.-STATESMAN, July 2, 1996, at A8 ("A severe drought has made water a precious

resource in Central Texas and throughout the state. Now more than ever, the water in the Edwards Aquifer must be managed to the advantage of everyone."); Jerry Needham, *The Water Crisis*, SAN ANTONIO EXPRESS-NEWS, June 30, 1996, at A1 ("The Texas Supreme Court's OK Friday for a regional authority to go to work managing the Edwards Aquifer still leaves the region wallowing in drought-induced water woes, but it provides a solid framework for problem solving, officials said Saturday."); *Texas: State Supremes Back Regulation of Edwards Aquifer*, GREENWIRE, July 2, 1996 ("A recent drought and unregulated pumping have substantially depleted the aquifer.").

26. Needham, *supra* note 25 ("Diverse interests across the aquifer—farmers, San Antonio and other cities, recreational interests at aquifer-fed springs as well as municipal and industrial users downstream—still will be jockeying for a favorable share of the aquifer's bounty through permits.").

27. *Sierra Club v. City of San Antonio*, 112 F.3d 789, 796 (5th Cir.1997).

28. EAAA § 1.092(d).

29. 21 Tex. Reg. 8401 (1996) (to be codified at 31 Tex. Admin. Code §§ 701.1–.6 and 701.11–.22) (proposed Aug. 26, 1996) (Edwards Aquifer Auth.).

the filing deadline.[30] In response to comments, the Authority moved the deadline to December 30, the following Monday.[31] With few other changes, the Authority adopted the proposed rules on October 31, effective November 21,1996.[32] As the Authority explained, although the initial rules did not lay out a complete permitting process, the Authority proposed them because it "believed it needed to provide notice to existing users as early as possible that December 30, 1996 will be the deadline for filing declarations of historical use."[33] On November 1, 1996, the Authority proposed further rules governing the process for reviewing permit applications,[34] which did not become effective until February 18, 1997.[35]

The Authority took steps to publicize the December 30 deadline as widely as possible. Respondent Chemical Lime, Ltd.'s predecessor in interest, APG Lime Corp., received a permit application form by mail mid-November, noticed the December 30 deadline prominently printed at the top of the form, and began gathering the historical data needed to submit it. APG's New Braunfels plant had been in operation since 1907, using limestone, water, and heat to manufacture lime used in purifying water and controlling sulphur emissions from coal-fired plants. For twenty-five years, the plant had used on average some 600 acre-feet—around 200 million gallons—of water a year.[36] APG's plant engineer, James Johnson, undertook to complete the permit application for the Authority but had trouble finding water usage data going back to 1972. In mid-December he telephoned the Authority to ask whether he could estimate water usage and was told he needed hard data. A few days before the deadline, he telephoned the Authority again to say that he would not be able to gather all the historical information in time. He was told that others were having problems, too, and that he should, as he recalled, "get it in when you get it—when you get that data on it." Based on that conversation, Johnson believed he could submit the application late. He was not told that if the application was

**30.** *Id.* at 8402 ("The injunction [in *Barshop*] was dissolved by the Texas Supreme Court, and the Act thereby became effective, on June 28, 1996.... In keeping with the intent of the Legislature, these rules require the filing of declarations of historical use by December 28, 1996, the date six months following the actual effective date of the Act.").

**31.** 21 Tex. Reg. 11377, 11381 (1996) ("The proposed rule called for a filing date of Saturday, December 28, 1996. After further review, the filing date has been changed to Monday, December 30, 1996, because the Authority believes that this date is more consistent with legislative intent and will avoid difficulties for applicants who find themselves needing to file their applications on a Saturday when the offices of the Authority are closed.").

**32.** *Id.* at 11384.

**33.** *Id.* at 11379 ("There simply was not adequate time to develop a full review and hearings process on applications for historical use by the time the Authority believed it needed to publish this initial set of rules. The Authority believed it needed to provide notice to existing users as early as possible that December 30, 1996 will be the deadline for filing declarations of historical use. With that goal in mind these rules were developed. The Authority and staff knew at the time of proposal that additional rules would have to be developed to complete most of the sections with regard to the review and hearings on applications for permits.").

**34.** 21 Tex. Reg. 11071 (1996) (to be codified at 31 Tex. Admin. Code §§ 701.31–.35, 701.51–.59, 701.71–.77, 701.91–.102, 701.121–.131, & 701.141–.147) (proposed Nov. 1, 1996) (Edwards Aquifer Auth.).

**35.** 22 Tex. Reg. 1393, 1405 (1997).

**36.** An acre-foot of water—43,560 cubic feet—is equal to about 325,851 gallons.

late, APG would lose its water, or that he could file an incomplete application by the deadline and supplement it later, which was the Authority's policy.

APG did not file its permit until January 17, 1997. The Authority did not notice that it was late and continued to process it, notifying APG in April 1998 that a permit would issue for 618.2326 acre-feet of water. In 1999, Chemical Lime acquired APG's plant and its interest in the permit application. Not until November 2000 did the Authority notify Chemical Lime that the application would be denied because it was filed after the deadline. Chemical Lime protested, but the Authority refused to reconsider.

Chemical Lime sued the Authority and its general manager and directors in their official capacities,[37] seeking a declaration that the application deadline should have been set no sooner than six months from this Court's denial of rehearing in *Barshop*, which would make Chemical Lime's application timely. Alternatively, Chemical Lime sought a declaration that it had substantially complied with the EAAA's permit requirements.[38] The deadline-validity issue was presented to the trial court on stipulated facts. The court concluded that the EAAA "became effective on August 16, 1996", the date rehearing was

denied in *Barshop*; that the December 30, 1996 deadline "established by the Authority rule ... is not a valid, legal deadline"; that the proper deadline was February 16, 1997; and that Chemical Lime's permit application was timely filed. The substantial-compliance issue was tried to a jury, which found for Chemical Lime. Based on its conclusions and the jury verdict, the trial court rendered judgment for Chemical Lime. The court awarded Chemical Lime $481,948.72 attorney fees, plus attorney fees on appeal.

The court of appeals affirmed but concluded that the permit application deadline should be six months from issuance of the mandate in *Barshop*, or August 10, 1997.[39] The court "express[ed] no opinion regarding the legal status or validity of acts performed under color of the EAA Act between the June 28, 1996 supreme court judgment in *Barshop* and the court's issuance of its mandate" on February 10, 1997.[40] Having determined that Chemical Lime's application was timely filed, the court did not reach Chemical Lime's argument that it had substantially complied with the statutory permit requirements.[41] The court affirmed the award of attorney fees to Chemical Lime.[42]

We granted the Authority and its

---

37. The Authority acknowledges that governmental immunity from suit is waived by section 36.251 of the Texas Water Code, which states: "A person, firm, corporation, or association of persons affected by and dissatisfied with any provision or with any rule or order made by a district is entitled to file a suit against the district or its directors to challenge the validity of the law, rule, or order. The suit shall be filed in a court of competent jurisdiction in any county in which the district or any part of the district is located. The suit may only be filed after all administrative appeals to the district are final." The term "district" includes an "authority created under ... Section 59, Article XVI, Texas Consti-

tution". TEX WATER CODE § 36.001(1). The Authority was created under that provision. EAAA § 1.02(b).

38. Chemical Lime urged other claims that are not before us, including a takings claim that was severed in the trial court.

39. 212 S.W.3d 683, 696 (Tex.App.-Austin 2006).

40. *Id.*

41. *Id.*

42. *Id.* at 698.

agents' petition for review.[43] Because their interests are aligned, we refer only to the Authority in addressing their arguments.[44] The Authority contends that (1) the December 30, 1996 permit application filing deadline was valid, (2) by missing the deadline Chemical Lime failed to substantially comply with the statutory requirements for a permit as a matter of law, (3) chapter 36 of the Texas Water Code precludes an award of attorney fees to Chemical Lime under the Declaratory Judgment Act and requires an award of attorney fees to the Authority. We address these arguments in turn.[45]

## II

To determine the validity of the Authority's December 30, 1996 permit application filing deadline, we begin with our decision in *Barshop*. One argument in that case against the constitutionality of the EAAA was that it set an impossible condition for compliance: a March 1, 1994 filing deadline that had expired before the Authority had even come into existence.[46] But the Legislature had amended the EAAA in 1995 to meet preclearance objections so that the Act could take effect, yet had not changed the deadline. So the argument had to be, not only that the deadline set by the EAAA turned out to be impossible, but that the Legislature *in-tended*—given its action in 1995—to set an impossible deadline, so that when the EAAA took effect, it would prohibit any withdrawal of water from the Edwards Aquifer by regular permit. The argument was that the Legislature had created a regulatory scheme to preserve a crucial resource that was not only destined to fail but intended to fail. We characterized this argument as "nonsensical" and the logical result of it "absurd".[47]

We explained the State's position this way:

> The State urges that we should interpret the March 1, 1994 date as directory rather than mandatory. The State maintains that we should consider the intent of the Legislature and construe this date to merely require that the declarations be filed with the Authority six months after the eventual effective date of the statute. We agree with the State.[48]

Thus, instead of adopting a "too literal construction of a statute, which would prevent the enforcement of it according to its true intent," [49] we took a more pragmatic approach. We noted that in *Stephenson v. Stephenson*,[50] we had held that a statutory period for filing an appellate transcript with the newly created courts of civil appeals did not begin to run until "the appel-

---

**43.** 51 Tex. Sup.Ct. J. 329 (Jan. 25, 2008).

**44.** We have received amicus briefs for the State of Texas and the City of San Antonio, both in support of reversal.

**45.** The State of Texas, as amicus curiae, argues that, because a judgment against the State is always superseded by the State's filing of a notice of appeal, the Authority had the discretion to implement the EAAA at any time while *Barshop* was pending. Thus, it argues, the December 30, 1996 filing deadline was valid regardless of when our decision in *Barshop* became legally effective. Our analysis of the case does not require us to reach

this argument, and we express no opinion on it.

**46.** *Barshop v. Medina County Underground Water Conserv. Dist.*, 925 S.W.2d 618, 628 (Tex.1996).

**47.** *Id.* at 629.

**48.** *Id.* at 628.

**49.** *Id.* at 629 (quoting *State v. Dyer*, 145 Tex. 586, 200 S.W.2d 813, 815 (Tex.1947) (internal quotation marks omitted)).

**50.** 22 S.W. 150 (Tex.1893).

late court clerk began operations".[51] "Similarly," we held that "the March 1, 1994 deadline contained in the [EAAA] was intended to provide existing users six months to file their declarations of historical use." [52] Accordingly, we interpreted the EAAA "as requiring declarations of historical use to be filed six months after the Authority becomes effective." [53]

Because of the prolonged delays in implementing the EAAA, it was not clear how long it would take the Authority to begin operations. In fact, the Authority took over from the District the same day our opinion in *Barshop* issued. The EAAA instantly transferred to the Authority all that was the District's. Because the EAAA became effective immediately in a practical sense, the Authority read *Barshop* to require a filing deadline six months later, irrespective of further proceedings in this Court,[54] although it extended the deadline two days from Saturday to Monday.[55] Not only was the Authority under pressure to act expeditiously, it was concerned that any later deadline would be subject to challenge.[56]

Despite the fact that the Authority began operations June 28, 1996, Chemical Lime argues, as the court of appeals held, that the EAAA did not become "effective" within the meaning of *Barshop* until the mandate issued in that case on February 10, 1997. Chemical Lime points to Rule 18.6 of the Texas Rules of Appellate Procedure, which provides that "[t]he appellate court's judgment on an appeal from an interlocutory order takes effect when the mandate is issued." Chemical Lime argues that the same rule should apply in an appeal from a final judgment. Alternatively, Chemical Line argues that the EAAA did not become effective until rehearing was denied in *Barshop* on August 16, 1996. But none of these arguments find support in *Barshop* itself. As Chemical Lime properly acknowledges, *Barshop's* approach to resetting the filing

---

**51.** 925 S.W.2d at 630.

**52.** *Id.*

**53.** *Id.*

**54.** 21 Tex. Reg. 11377, 11381 (Nov. 22, 1996) ("A commenter contended that the filing date should be February 28, 1997, which is six months after the date the Texas Supreme Court issued its mandate on August 31, 1996 in *Barshop v. Medina County Underground Water Conservation District,* sending the case back to the trial court. The filing date stated in the rule is December 30, 1996, six months after the Texas Supreme Court dissolved the trial court injunction that had blocked the Act from taking effect. The staff adheres to the December date, because the Act became fully effective on June 28, 1996, when the injunction was dissolved. The dissolution of the injunction was immediately effective, and was not delayed by subsequent procedural steps in the Supreme Court. The staff recommends against adopting the February date because it is inconsistent with the Legislature's intent to require filing of declarations of historical use six months after the actual effective date of the Act. Adopting the later date would also expose those applicants who would file after December 30, 1996, to litigation attacking the filings as untimely.").

**55.** *See supra* note 31; *see Pitcock v. Johns,* 326 S.W.2d 563, 565–566 (Tex.Civ.App.-Austin 1959, writ ref'd) (citing *Gardner v. Universal Life & Accident Ins. Co.,* 164 S.W.2d 582 (Tex.Civ.App.-Dallas 1942, writ dism'd w.o.j.) and former Tex Rev.Civ. Stat. art. 23, § 15 (1925) (" 'Month' means a calendar month."), first codified as Tex.Rev.Civ. Stat. art. 3140, § 10 (1879), and currently as Tex. Gov't Code § 312.011(7)); *see also Campbell & Son v. William G. Lane & Co.,* 25 Tex.Supp. 93 (1860); Op. Tex. Att'y Gen. No. 0–1492 (1939); *cf.* Tex. Gov't Code § 311.014(b), (c) (providing that, in construing a code provision, "[i]f the last day of any period is a Saturday, Sunday, or legal holiday, the period is extended to include the next day that is not a Saturday, Sunday, or legal holiday.").

**56.** 21 Tex. Reg. at 11381.

deadline was entirely pragmatic.[57] *Bar-shop* set a new filing deadline based not on the legal effect of some procedural occurrence in that case but on the practical reality of the Authority's commencement of operations.

Further in the alternative, and focusing instead on practicalities, Chemical Lime argues that since the Legislature's intent in the EAAA was, as we stated in *Bar-shop*, "to provide existing users six months to file their declarations of historical use",[58] the period should run from the effective date of the Authority's rules governing the application process—November 21, 1996—or at the earliest, from the date those rules were proposed—August 31, 1996. But this is an argument, not that the Authority misconstrued *Barshop*, but that *Barshop* was wrongly decided. There is nothing to indicate that the inevitable delay in promulgating rules would have been any less had the EAAA taken effect in 1993. It was never possible for final rules to be in effect six months before the filing deadline. Nor did the lack of final rules hamper the filing process. The difficulty applicants faced lay not in any uncertainty over what rules would apply but in gathering the required data on water use. Out of more than a thousand applications the Authority received, only twenty-two were late, and there is no evidence that any delay was attributable to the promulgation of the Authority's rules.

The parties have devoted much attention to the problems in determining when, as a general matter, an appellate court decision takes effect. The concurring opinions shed helpful light on these problems and strongly suggest that this is an aspect of Texas appellate procedure that could well benefit from more definite rules and procedures. We conclude, however, that this case turns not on when our decision in *Barshop* became effective, but when the Authority became effective. On that issue, the facts leave no doubt that the Authority permissibly set the permit application filing deadline at December 30, 1996.

### III

■ The jury found that Chemical Lime substantially complied with the EAAA's permit application requirements, and the trial court rendered judgment on their verdict. The Authority contends that Chemical Lime failed to substantially comply with the statutory requirements as a matter of law. The issue was not addressed by the court of appeals, but it has been briefed in this Court, and we elect to resolve it.

■ The doctrine of substantial compliance, though certainly familiar to the law, lacks comprehensive definition, so we begin with several limiting assumptions based on what the parties here do and do not argue. We assume, because the Authority does not argue to the contrary, that the EAAA does not require strict compliance with permit application requirements. The assumption is a reasonable one, since one of the EAAA's express requirements is that a "declaration of historical use must be filed ... on a form prescribed by the board [of directors]",[59] though there is nothing to indicate that filing the same information on plain paper

---

57. Brief for Respondent 5 ("The Court selected that prospective trigger date for the six-month clock based on *Stephenson v. Stephenson*, 22 S.W. 150 (Tex.1893), where the Court pragmatically held that a deadline for filing an appellate transcript did not expire before the newly-created courts of civil appeals were ready to accept such filings. *See Barshop*, 925 S.W.2d at 630.").

58. 925 S.W.2d at 630.

59. EAAA § 1.16(b).

would require rejection of the application. We also assume that substantial compliance with a statute means compliance with its essential requirements, since the parties agreed that this was a correct statement of the law for the jury charge. We assume further, to the extent it is relevant, again because the Authority does not argue otherwise, that Chemical Lime tried in good faith to file its permit application by the deadline. Although it would seem that a person who meets essential statutory requirements has substantially complied, even if not acting in complete good faith, it is clear that a person's good faith is not enough for substantial compliance when essential statutory requirements like a deadline are not met. Finally, since the Authority initially approved Chemical Lime's application before noticing that it was late-filed, we assume that Chemical Lime complied with all statutory requirements except the December 30, 1996 filing deadline—that is, that Chemical Lime is an existing user that established by convincing evidence beneficial use of underground water from the aquifer during the 21–year period before June 1993. Since the Authority barely mentions late payment of the fee, the question we decide boils down to this: did the Legislature consider the permit application filing deadline essential to the EAAA?

■ We think the answer must be yes. To be clear, the issue is not whether Chemical Lime substantially complied with the filing deadline. A deadline is not something one can substantially comply with. A miss is as good as a mile.[60] As the United States Supreme Court has explained:

> The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle. If 1–day late filings are acceptable, 10–day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced. Any less rigid standard would risk encouraging a lax attitude toward filing dates. A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day.[61]

Rather, the issue is whether Chemical Lime substantially complied with the permit application process, one requirement of which was the filing deadline.

The importance of a fixed filing deadline is apparent in the EAAA. The Legislature picked a specific, calendar date by which permit applications were required to be filed. It did not delegate that responsibili-

---

**60.** More accurately: "An ynche in a misse is as good as an ell." W. CAMDEN, REMAINS CONCERNING BRITAIN 303 (2d ed. 1614). An ell was a unit of measurement used by English tailors, usually 45 inches.

**61.** *United States v. Locke*, 471 U.S. 84, 100–101, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (citation and internal quotation marks omitted). Justice O'Connor, concurring, opined that, because the Court's prior decisions did not necessarily bar the use of equitable estoppel in those circumstances, the Court's reversal did not in itself establish that the claimants would ultimately forfeit their mining claims, in further proceedings after remand. *Id.* at 110–112, 105 S.Ct. 1785. In the case at bar, other claims remain pending in the district court, but we offer no opinion on the claims not before us.

ty to the Authority. It made no provision for extensions and did not empower the Authority to do so. Its intent that applicants strictly adhere to the deadline is thus fairly clear. Though it became necessary for this Court to reset the deadline to preserve the constitutionality of the EAAA, it was not necessary, nor would it have been proper, to change the character of the new deadline, making it less mandatory than the Legislature originally intended.

The need for a filing deadline, with no exceptions, is also apparent. The Legislature found it necessary to cap annual water withdrawals to protect the aquifer. Because applications would exceed the cap, with no fixed cutoff, the Authority would be required to constantly readjust allocations among permittees to provide for late applicants. Indeed, the Authority argues that if Chemical Lime's application is deemed timely and approval required, all permits must be adjusted, albeit slightly (about 0.1%[62]), for total annual withdrawals from the aquifer to remain at the statutory limit. The Legislature could certainly have concluded that such readjustments should be avoided.

Had Chemical Lime filed an incomplete or inaccurate application, its argument for substantial compliance would be stronger, even though as a practical matter, it would make no discernible difference to the permitting process whether an application was amended after the deadline or filed a few days late. But a line must be drawn somewhere, and the Legislature was not required to draw it with perfect precision. Chemical Lime points out that in *Barshop* we agreed with the State that the March 1, 1994 filing deadline in the EAAA was "directory rather than mandatory".[63] Chemical Lime contends that the law permits substantial compliance with non-mandatory filing deadlines. But in *Barshop*, we held only that the expired deadline was directory because, as we have already explained, any other reading would have led to an absurd result. We did not suggest that a viable deadline would also be merely directory.

Although the EAAA states that a declaration of historical use "must be filed" by the deadline,[64] Chemical Lime argues that because the EAAA prescribes no penalty for late filing, the deadline should not be treated as mandatory. We have said that "[t]he word 'must' is given a mandatory meaning when followed by a noncompliance penalty"[65] but this does not suggest that when no penalty is prescribed, "must" is non-mandatory. "When the statute is silent [regarding the penalty for noncompliance], we have looked to its purpose for guidance."[66] The EAAA does not suggest that an applicant can be fined for a late filing or that the water allocated should be reduced accordingly. The only penalty the EAAA suggests is that late applications will not be considered.

We recognize the hardship of this penalty to Chemical Lime, but we believe the

**62.** Chemical Lime's temporarily approved permit for 618.2326 acre-feet would be about one-thousandth of the 572,000 acre-feet total annual withdrawals now permitted by the EAAA.

**63.** *Barshop v. Medina County Underground Water Conserv. Dist.*, 925 S.W.2d 618, 628 (Tex.1996).

**64.** EAAA § 1.16(b).

**65.** *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001) (internal quotation marks omitted). *See also* Tex. Gov't Code § 311.016(3) (" 'Must' creates or recognizes a condition precedent.").

**66.** *Hines v. Hash*, 843 S.W.2d 464, 468 (Tex. 1992).

EAAA requires a firm deadline. Chemical Lime's late filing did not substantially comply with the statute's permitting requirements.

## IV

■■ The trial court awarded Chemical Lime attorney fees under the Declaratory Judgment Act (DJA). The Authority argues that it can be sued only under chapter 36 of the Texas Water Code, and that chapter does not provide for recovery of attorney fees by the plaintiff. While section 36.251 does provide for suit against the Authority,[67] section 36.254 states that that remedy "do[es] not affect other legal or equitable remedies that may be available." The Authority has not advanced an argument why we should not take section 36.254 at its word. Nor does the Authority argue that the DJA permits an award of attorney fees only to a prevailing party, an issue on which we express no opinion.[68] The Authority does not challenge the reasonableness or necessity of the fees awarded by the trial court.[69] But an award must

be equitable and just,[70] considerations addressed to the trial court's discretion.[71] Now that Chemical Lime is no longer the prevailing party, the trial court should have the opportunity to reconsider its award.

■ Because the Authority has prevailed, it is entitled to attorney fees under section 36.066(g) of the Water Code.[72] The parties stipulated below to the amount of those fees.[73]

## V

Accordingly, the court of appeals' judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

Justice BRISTER filed a concurring opinion.

Justice WILLETT filed a concurring opinion.

Justice BRISTER, concurring.

It has been said that "any law student, after a month in law school, knows that the

---

67. *See supra* note 37.

68. *Compare Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 868 (Tex.App.-Dallas 2003, pet. denied) (a nonprevailing party may recover attorney fees under the Declaratory Judgment Act), *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 731 (Tex.App.-Waco 1998, pet. denied) (same), *Maris v. McCraw*, 902 S.W.2d 191, 194 (Tex.App.-Eastland 1995, writ denied) (same), *and Tanglewood Homes Ass'n, Inc. v. Henke*, 728 S.W.2d 39, 45 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.) (same), *with City of Houston v. Harris County Outdoor Adver. Ass'n*, 732 S.W.2d 42, 56 (Tex. App.-Houston [14th Dist.] 1987, no writ) (stating that it is an abuse of discretion to award attorney fees to a party who is not entitled to declaratory relief).

69. The trial court awarded Chemical Lime $481,948.72 for attorney fees incurred through rendition of final judgment, plus $100,000.00 for attorney fees through proceedings in this Court.

70. *See* TEX. CIV. PRAC. & REM.CODE § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

71. *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex.1998).

72. TEX. WATER CODE § 36.066(g) ("If the district prevails in any suit other than a suit in which it voluntarily intervenes, the district may seek and the court shall grant, in the same action, recovery for attorney's fees, costs for expert witnesses, and other costs incurred by the district before the court. The amount of the attorney's fees shall be fixed by the court.").

73. The parties stipulated that the Authority's reasonable attorney fees were $253,525.50 in the trial court and would be $100,000.00 on appeal.

answer to the question 'Define X,' is: 'For what purpose are we defining this term?' " [1]  In this case, we must define "take effect" for the purpose of deciding when our judgments become the law, not when they become final. One would think judgments from this Court would become the law immediately. Indeed, there is no foreboding in the term "Judgment Day" if nothing happens until "Mandate Day."

I agree with the Court that our decisions can take effect whenever we say they do. For example, in the school finance cases we postponed the effective date of one judgment for seven months,[2] another for six months,[3] and another for more than a year[4]—all long after the judgment was final and the mandate had issued. Similarly, in a handful of special cases the Legislature has provided that an appellate judgment takes effect *before* the mandate,[5] *with* the mandate,[6] and *after* the mandate.[7]

But except in such special cases, it would be a waste of time for courts to set each effective date individually. Circumstances may dictate when a special judgment should take effect, but for all other judgments we need a general rule. Accordingly, I join in the Court's judgment and all parts of its opinion except those that leave the general rule up in the air. For several reasons, the obvious and logical general rule is that our decisions should take effect on the date of judgment.

## I. What Matters Is The Judgment

First of all, we should start with the principle that cases are decided by judgments, not mandates. Judgments are rendered by the court,[8] and a majority of the court must agree to them.[9] Mandates, by contrast, are drafted and signed by the clerk;[10] judges rarely even see them. As Justice Pope wrote for this Court 30 years ago in *Burrell v. Cornelius:* "Judges render judgment; clerks enter them on the minutes." [11]  Our decisions should take effect when the justices act, not the clerk.

Second, the appellate rules recognize in many places that the operative act binding the parties is the judgment, not the mandate:

· when a party dies during an appeal, "the appellate court's *judgment* will have the same force and effect as if

---

1. Alan Hyde, *Response to Working Group on Chapter 1 of the Proposed Restatement of Employment Law: On Purposeless Restatement,* 13 Emp. Rts. & Emp Poly' J. 87, 87 (2009).

2. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 399 (Tex.1989) (postponing effective date of October 2, 1989 opinion until May 1, 1990).

3. *See Neeley v. W. Orange–Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 799 (Tex.2005) (postponing effective date of November 22, 2005 opinion until June 1, 2006).

4. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 523 (Tex.1992) (postponing effective date of January 30, 1992 opinion until June 1, 1993).

5. *See* Tex. Lab.Code § 102.074(c) (providing that labor arbitration takes effect 11 days after date of appellate decision).

6. *See* Tex. Alco. Bev.Code § 61.34(c) (providing that if alcoholic beverage license issued by order of district court is reversed on appeal, "the mandate of the appellate court automatically invalidates the license").

7. *See* Tex. Bus. Corp. Act art. 7.02(F) (allowing period to cure corporate defaults up to 60 days after appellate mandate issues).

8. *See, e.g.,* Tex.R.App. P. 43.1, 43.3, 43.5, 46.1, 46.2, 60.5.

9. Tex.R.App. P. 41.1.

10. *See* Tex.R.App. P. 18.1.

11. 570 S.W.2d 382, 384 (Tex.1978).

rendered when all parties were living";[12]

· when public officials leave office, their successors "will be bound by the appellate court's *judgment* ....";[13] and

· when a party voluntarily appears on appeal, or learns of its outcome, that party "is bound by the opinion, *judgment,* or order...."[14]

Because the judgment is the operative act of a court, its date should be the operative date.

Third, our judgments should mean what they say. "The controlling intention of the court's judgment is that expressed on the face of the judgment...."[15] If our judgment says something can or can't be done, then that ought to be the law—immediately.[16] If a judgment orders children taken from or returned to their parents, that

should not wait for the mandate. If a judgment declares a fee unconstitutional, collection ought to stop at once.[17] If our judgments have no effect until the mandate issues, then they do not mean what they say.[18]

Fourth, our standard treatment of stay orders shows we intend judgments to take effect immediately. The clerk cannot lift a stay order; the court must do so, and our standard procedure has been to lift a stay when we issue our judgment.[19] The same practice is used in the courts of appeals: stays are lifted when the judgment issues.[20] If our judgments do not take effect immediately, then parties can do whatever they want in the purgatory between judgment and mandate.

Fifth, for several decades we have tried to simplify the rules of procedure by insist-

---

12. Tex.R.App. P. 7.1(a)(1) (emphasis added).

13. Tex.R.App. P. 7.2(b) (emphasis added).

14. Tex.R.App. P. 15.2 (emphasis added).

15. *Harrison v. Manvel Oil Co.,* 142 Tex. 669, 180 S.W.2d 909, 915 (1944).

16. *See Flanary v. Wade,* 102 Tex. 63, 113 S.W. 8, 10 (1908) (holding appellate reversal of trial court judgment immediately barred enforcement of it, even though judgment had not been superseded and appeal was not final); *Carpenter v. First Nat'l Bank,* 20 S.W. 130, 131 (Tex.1892) (holding Supreme Court order quashing writ "took effect at once, and put the parties in the same position as if no order of quashal had ever been entered"); *Bichsel v. Heard,* 328 S.W.2d 462, 467 (Tex. Civ.App.-San Antonio 1959, no writ) (holding police chief could not be held in contempt for insisting on polygraph allowed by court of appeals during pendency of rehearing because court could not "punish him for taking for granted that we meant just what we said when we stated that the injunction was dissolved"); *accord, Matter of Bohart,* 743 F.2d 313, 321 n. 7 (5th Cir.1984).

17. In *In re Long* we held the Dallas County Clerk could not be held in contempt for charging an improper fee "until the appeals

were final and mandate issued." 984 S.W.2d 623, 626 (Tex.1999). But in that case the Clerk filed a writ of error in this Court, thereby superseding the court of appeals' judgment so that it did not take effect immediately. *See* Tex.R.App. P. 51.1(b).

18. Applying the same rule, if we order the trial court to vacate an injunction rather than doing so ourselves, *see, e.g., HEB Ministries, Inc. v. Texas Higher Educ. Coordinating Bd.,* 235 S.W.3d 627, 661 (Tex.2007), then the effective date would be postponed until then.

19. *See, e.g., Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex.1995) (noting that this Court lifted stay when it denied mandamus relief); *In re Helena Chem. Co.,* 286 S.W.3d 492, 495 (Tex.App.-Corpus Christi, 2009, orig. proceeding) (noting that Texas Supreme Court lifted stay when it granted mandamus relief).

20. *See, e.g., In re Office of Attorney Gen.,* 257 S.W.3d 695, 697 (Tex.2008) (noting that court of appeals lifted stay when it denied mandamus relief); *In re Dallas Area Rapid Transit,* 967 S.W.2d 358, 359 (Tex.1998) (same); *Waite v. Waite,* 76 S.W.3d 222, 223 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (dismissing appeal as moot and lifting stay).

ing that judgments bear a date and that deadlines run from it. To quote Justice Pope in *Burrell* again:

> Law professors should teach, writers of legal form books should so correct their books, lawyers should so draft documents, and judges should make certain that above the signature on each judgment or order there are the words: "Signed this _____ day of _____, 19_____."[21]

Today, an appellate decision takes effect on the date of judgment for many purposes, including: when plenary power expires in the court of appeals;[22] when a judgment becomes dormant;[23] when limitations runs for filing a bill of review;[24] when indemnity and third-party claims accrue;[25] and when tolling ends on alter ego claims.[26] Clarity and certainty are lost if the judgment date counts for these purposes, but does not count when deciding when the judgment takes effect.

Sixth, judgments take effect immediately for all who are not parties in the case. Usually our opinions apply both prospectively and retroactively,[27] but sometimes we apply a decision prospectively only, in which case our standard practice has been to declare the law from the date of judgment, not the date of finality or the mandate.[28] This appears to be the practice of our sister court too.[29] It would be very odd for our decisions to take effect for third parties *before* they take effect for the parties involved in the case.

Seventh and finally, we expect lower courts to follow our decisions without receiving an explicit order to do so.[30] In

---

**21.** *Burrell v. Cornelius*, 570 S.W.2d 382, 384 (Tex.1978).

**22.** *See* Tex.R.App. P. 19.1.

**23.** Tex. Civ. Prac. & Rem.Code § 34.001; *John F. Grant Lumber Co. v. Bell*, 302 S.W.2d 714, 715 (Tex.Civ.App.-Eastland 1957, writ ref'd).

**24.** *See Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex.1998); *see also* Tex. Prob.Code § 55(a).

**25.** *See Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 210 (Tex.1999); *J.M.K. 6, Inc. v. Gregg & Gregg, P.C.*, 192 S.W.3d 189, 200 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

**26.** *See Matthews Constr. Co., Inc. v. Rosen*, 796 S.W.2d 692, 694 (Tex.1990).

**27.** *See Centex Homes v. Buecher*, 95 S.W.3d 266, 277 (Tex.2002); *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex.1992).

**28.** *See State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 720 (Tex.1996) (applying decision prospectively from date of opinion); *Elbaor*, 845 S.W.2d at 251 (same); *Reagan v. Vaughn*, 804 S.W.2d 463, 468 (Tex.1990)

(same); *Huston v. F.D.I.C.*, 800 S.W.2d 845, 849 (Tex.1990) (same); *see also Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 103 (Tex.1984) (applying opinion prospectively from date of first opinion rather than opinion on rehearing); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex.1984) (same); *In re J. J.*, 617 S.W.2d 188, 188 (Tex.1981) (applying prospective decision to case still pending when decision issued); *see also Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 115 (Tex.1984) (applying prospective decision from date rehearing was overruled). *But cf. Lohec v. Galveston County Comm'rs Ct.*, 841 S.W.2d 361, 366 n. 4 (Tex.1992) (applying decision prospectively from date of trial court's judgment); *Felderhoff v. Felderhoff*, 473 S.W.2d 928, 933 (Tex.1971) (applying decision prospectively from date accident occurred).

**29.** *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex.Crim.App.2006) ("Effective from the date of this opinion, the requirement is: upon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings."); *Geesa v. State*, 820 S.W.2d 154, 164–5 (Tex.Crim.App.1991) (applying decision prospectively from date of opinion).

**30.** *See Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273

mandamus cases, we generally grant the writ conditionally because we expect lower courts to comply without receiving the writ. But how can we expect lower courts to comply with our opinions immediately if they have not yet taken effect?

## II.  What About the Opinion?

One could argue that our decisions should take effect on the date of opinion rather than the date of judgment. In cases remanded for proceedings consistent with our opinion, the lower courts must have the opinion to carry out the judgment.[31] Of course in most cases the opinion and judgment issue together, so the effective date for both is the same.[32] But in a few cases they are different, and in those cases the date of judgment is more important.

In a few emergencies, we have issued judgments or orders with opinions to follow.[33] For example, in *In re Doe* we issued a judgment on March 10, 2000 and the opinions three months later.[34] In such cases, we clearly intended the judgments to take effect immediately; there was no other reason to issue them before the opinions were ready. And we certainly did not intend those judgments to take effect only

when the mandate issued much later. Opinions, motions for rehearing, and mandates can issue in due course, but judgments ought to take effect immediately.

It is true that in emergency cases we can order the mandate issued early and deny the parties the right to file a motion for rehearing.[35] But prohibiting motions for rehearing can mean missing an opportunity to correct a mistake. The best way to make judgments effective immediately, while still allowing for mistakes, is to make the effective date the date of judgment.

## III.  What About the Mandate?

JUSTICE WILLETT's proposal that our decisions should take effect only when the mandate issues will not work for one primary reason: after many of our opinions there is no mandate. Mandates issue only after a judgment.[36] No mandate issues when we deny a petition, even if we do so by written opinion. Nor do mandates issue in mandamus proceedings, which we decide by "orders" rather than "judgments." [37] If a mandate is required before this Court's decisions take effect, then many of them never have and never will.

---

S.W.3d 659, 666 (Tex.2008) ("It is fundamental to the very structure of our appellate system that this Court's decisions be binding on the lower courts.").

31.  *See Perry Nat'l Bank v. Eidson*, 161 Tex. 340, 340 S.W.2d 483, 487 n. 2 (1960) (noting that where a judgment refers to further proceedings consistent with the court's opinion, "[t]he nature of the judgment is therefore determined by an inspection of the opinion").

32.  *See* TEX.R.APP. P. 63 (requiring Supreme Court to "hand down a written opinion in all cases in which it renders a judgment," and our clerk to send both opinion and judgment to the lower court clerks, the regional administrative judge, and the parties); *see also* TEX R.APP P. 48.1 (requiring court of appeals' clerk to send both opinion and judgment

"[o]n the date when an appellate court's opinion is handed down").

33.  *See, e.g., In re Doe 1*, 19 S.W.3d 300, 300 (Tex.2000); *Texas Water Comm'n v. Dellana*, 849 S.W.2d 808, 809 n. 1 (Tex.1993); *Davenport v. Garcia*, 837 S.W.2d 73, 73 (Tex.1992).

34.  19 S.W.3d 346, 349 (Tex.2000).

35.  *See* TEX.R.APP. P. 18.1(c), 49.4, 64.1.

36.  *See* TEX.R.APP. P. 18.1 ("The clerk of the appellate court that rendered the judgment must issue a mandate in accordance with the judgment....").

37.  *See* TEX.R.APP. P. 52.8(c) ("If the court determines that relator is entitled to relief, it must make an appropriate order.").

But there's more. From 1892 until 1978, Texas law prohibited clerks from issuing a mandate until court costs were paid.[38] Thus, for example, the first rules of civil procedure in 1941 provided:

> On the rendition of a final judgment or decree in the Supreme Court, the clerk of said court shall not issue and deliver the mandate of the court, nor certify the proceedings to the lower court, until all costs accruing in the case in the Supreme Court and the Court of Civil Appeals have been paid … [39]

If costs were not paid within 12 months, the case was simply dismissed *and no mandate ever issued.*[40] These rules were replaced in 1978,[41] but it is hard to say how many judgments before then were never followed by a mandate. So which of our opinions have never taken effect? And how would anyone know without looking through files perhaps 100 years old?

As we explained in *Continental Casualty Co. v. Street* in 1963, a mandate is a procedural device intended to keep courts from issuing conflicting orders:

> The rules relating to the return of the mandate from the appellate to the trial court are … primarily procedural in nature. They provide for an orderly dispatch of judicial business by adopting procedures under which both the appellate and trial courts may have knowledge of the status of pending litigation and thus prevent the issuance of conflicting orders by the courts of the trial and appellate levels.[42]

Mandates are thus a means of communication between courts; they were not even required to be sent to the parties until 2003.[43]

38. Act approved April 13, 1892, 22nd Leg., 1st C.S., ch. 14 § 1, 1892 Tex. Gen. Laws 19, 23 (codified as rule of civil procedure 443 in 1941, amended 1978) ("The clerk of the Supreme Court shall not deliver the mandate of the court until all costs of that court and of the court of civil appeals have been paid."); *see also* Act approved April 13, 1892, 22nd Leg., 1st C.S., ch. 15, § 47, 1892 Tex. Gen. Laws 25, 33 (amended 1978) (companion provision for court of civil appeals).

39. Tex.R. Civ. P. 507 (adopted Oct. 29, 1940, eff. Sept. 1, 1941, amended 1978); *see also* Tex.R. Civ. P. 443 (adopted Oct. 29, 1940, eff. Sept. 1, 1941, amended 1978) (companion rule for courts of civil appeals).

40. Tex.R. Civ. P. 509 (adopted Oct. 29, 1940, eff. Sept. 1, 1941, repealed 1978) ("When a case is reversed and remanded, no mandate shall issue after twelve months from the rendition of final judgment of the Supreme Court, or the overruling of a motion for rehearing. When a cause is reversed and remanded by the Supreme Court, and the mandate is not taken out within twelve months as hereinbefore provided, then, upon the filing in the court below of a certificate of the clerk of the Supreme Court that no mandate has been taken out, the case shall be dismissed from the docket of said lower court."); *see also* Tex.R. Civ. P. 445 (adopted Oct. 29, 1940, eff. Sept. 1, 1941, repealed 1978) ("In cases which have been reversed and remanded by a Court of Civil Appeals, if no mandate shall have been taken out and filed in the court where the cause originated within one year after the motion for rehearing is overruled or final judgment rendered, then upon the filing in the court below of a certificate of the clerk of the Court of Civil Appeals where the cause was pending that no mandate has been taken out, the case shall be dismissed from the docket."); Act approved April 10, 1901, 27th Leg., R.S., ch. 54, § 1, 1901 Tex. Gen. Laws 122, 123 (repealed 1978). For examples of the application of these rules, *see Dignowity v. Fly*, 110 Tex. 613, 210 S.W. 505, 506 (1919); *Davy Burnt Clay Ballast Co. v. St. Louis Sw. Ry. Co.*, 32 S.W.2d 209, 211 (Tex.Civ.App.-Dallas 1930), *writ ref'd*, 119 Tex. 455, 32 S.W.2d 822 (1930).

41. *See* Tex R. Civ. P. 507 & 443 (amended by order of July 11, 1977, eff. Jan. 1, 1978).

42. 364 S.W.2d 184, 187 (Tex.1963).

43. Tex.R.App. P. 12.6 (1997, amended 2003); Tex.R.App. P. 18.1 (1997, amended 2003).

This is why the rules provide for enforcement of our decisions only after the mandate.[44] Postponing *enforcement* of our decisions is not the same as postponing when they are *effective;* indeed an injunction or declaratory judgment cannot be enforced by contempt unless it becomes effective sometime earlier. Appellate courts do not entertain motions for turnover, garnishment, or contempt; those must be filed in the trial court. Absent supersedeas, this means the case can be proceeding in two courts at once. In such cases, the mandate is our notice to the trial court that it can start enforcing a new judgment or proceed with enforcement of the old one without stepping on our toes.

This is also why a judgment in an interlocutory appeal "takes effect when the mandate is issued."[45] Here again, an interlocutory appeal (unlike a final appeal) means the case is pending in two courts at once. As a result, there is a daily potential for conflicting orders. The standard solution is to abate action in one of the two courts, as we do in cases of dominant jurisdiction.[46] Sometimes, a statute or stay from the appeals court keeps the trial court from issuing conflicting orders.[47]

But in other cases, it may be best for the trial court to proceed, with the appellate court's orders taking effect only with the mandate. The reason our rules abate the effective date in interlocutory appeals until the mandate, but say nothing about abating the effective date for final appeals, is because the two cases are not the same.

## IV. What About Finality?

If finality is the goal, the mandate is not the answer. First of all, mandates issue 10 days *after* our judgment is final;[48] any argument to postpone the effective date until finality does not justify postponing it 10 days more. Moreover, mandates can be recalled;[49] so while judgments and opinions can change, mandates can too.

The problem is that it is hard to say when our decisions are final. The rules of procedure place no explicit limit on our plenary power, as they do for the courts of appeals.[50] And as we have noted several times before, judgments become "final" for different purposes at different times.[51] Thus, for the purpose of review by the United States Supreme Court, a judgment from this Court is "final" immediately, not

---

**44.** *See* Tex.R.App. P. 51.1(b) ("When the trial court clerk receives the mandate, the appellate court's judgment must be enforced."); Tex.R.App. P. 65.2 ("If the Supreme Court renders judgment, the trial court need not make any further order. Upon receiving the Supreme Court's mandate, the trial court clerk must proceed to enforce the judgment of the Supreme Court as in any other case.").

**45.** Tex.R.App. P. 18.6.

**46.** *See Perry v. Del Rio,* 66 S.W.3d 239, 252 (Tex.2001) ("As a rule, when cases involving the same subject matter are brought in different courts, the court with the first-filed case has dominant jurisdiction and should proceed, and the other cases should abate.").

**47.** *See* Tex. Civ. Prac. & Rem Code § 51.014; Tex.R.App P. 52.10.

**48.** *See* Tex.R.App. P. 18.1(b); *John F. Grant Lumber Co. v. Bell,* 302 S.W.2d 714, 717 (Tex. Civ.App.-Eastland 1957, writ ref'd) (Although a mandate cannot issue until the judgment is final, "the issuance of a mandate was not necessary 'to render the judgment final.' ") (citing *Cont'l Gin Co. v. Thorndale Mercantile Co.,* 254 S.W. 939, 941 (Tex. Com.App.1923, judgment adopted)).

**49.** Tex R.App P. 18.7.

**50.** *See* Tex R. Civ. P. 19.

**51.** *See Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005) (noting that "the term 'final,' as applied to judgments, has more than one meaning"); *Street v. Hon. Second Ct. of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

when the mandate issues.[52] For purposes of res judicata and collateral estoppel, a judgment is also "final" even if the appeal is not.[53] Holding that our judgments do not take effect until they are "final" serves only to confuse when they actually take effect.

As a historical matter, our judgments almost never change on rehearing. In the last 10 fiscal years, this Court issued more than 1100 majority and per curiam opinions. On rehearing, we changed less than 50 of the opinions, and those almost always in minor respects that had no effect on the judgment. In only four cases did the prevailing party in the judgment change.[54] Thus, the chance that an original judgment will differ from the final judgment is about 1 in 300. We should not let such long odds dictate the general rule about when our judgments take effect.

Finally, there are also constitutional considerations in deciding when our decisions take effect. The Texas Constitution grants the Legislature alone the power to suspend laws.[55] That provision has never prevented the courts from suspending a law that is itself unconstitutional. But once we decide that a law *is* constitutional, keeping the law suspended during our administrative steps leading to finality and a mandate is (to say the least) problematic.

\* \* \*

When a mandate conflicts with a judgment or opinion, it is the mandate that must yield.[56] The same should be true regarding when our decisions take effect. Perhaps "it ain't over till it's over," but a judgment from the Supreme Court of Texas ought to mean "it's over." Accordingly, as a general rule I would hold that our decisions take effect when we issue a judgment.

Justice WILLETT, concurring.

I agree with the Court that under *Barshop*[1] the Edwards Aquifer Authority became effective on the date of our opinion in that case. The issue as briefed to us, however, and as addressed at length by the court of appeals, raised a more fundamental legal question: When does an appellate-court judgment become final and take effect? This vexing question will no doubt recur and, in my view, warrants the Court's rulemaking attention. To some degree, the issue has a certain "angels dancing on the head of a pin" quality to it, interesting (to some) as a matter of logic and perplexing (to all) as a matter of practice. It is confounding, to be sure, but also consequential.

So I join in the Court's judgment and, like JUSTICE BRISTER, most of its opinion. But as a general matter the bet-

---

52. See Sup.Ct. R. 13(3) ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice).").

53. See *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 6 (Tex.1986).

54. See *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex.2008); *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42 (Tex.2008); *F.F.P. Operating Part-*

*ners, L.P. v. Duenez*, 237 S.W.3d 680 (Tex. 2007); *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268 (Tex. 2002).

55. See Tex. Const. art. I, § 28 ("No power of suspending laws in this State shall be exercised except by the Legislature.").

56. See, e.g., *O'Neil v. Mack Trucks, Inc.*, 551 S.W.2d 32, 32 (Tex.1977).

1. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618 (Tex. 1996).

ter default date is the mandate, the formal order declaring our review complete, our decision final, and our judgment enforceable. Yogi Berra was right: In law as in life, "It ain't over 'til it's over." [2]

\* \* \*

An appellate court's mandate is the official order declaring to the district court, the parties, and all other interested persons that the court has closed the book on its review and is once-and-forall finished. I can understand, therefore, why the court of appeals and Chemical Lime view the date of our mandate in *Barshop* as when the Authority and the Edwards Aquifer Authority Act became effective. Their po-

sition is hardly unreasonable. A decision from this Court, of course, is subject to a motion for rehearing, and can also be reconsidered on our own motion.[3]

The Authority says the date of the *Barshop* mandate is inappropriate because issuance of the mandate is merely the "ministerial act" of a court clerk.[4] I disagree. The mandate under our rules is not a mere ministerial postscript or duplicative reminder. Our rules require appellate courts to prepare a mandate, without which an appellate-court judgment cannot be enforced.[5]

Several statutes also tie the finality of appellate-court decisions to issuance of the mandate.[6] If the mandate served no

**2.** Yogi Berra with Dave Kaplan, *When You Come to a Fork in the Road, Take It!* 88 (Hyperion 2001); *see also* Carlo DeVito, *Yogi: The Life & Times of an American Original* 285–286 (Triumph Books 2008) (explaining the offbeat etymology of this famous Yogiism); *see also generally* Stacy Obenhaus, *It Ain't Over 'Til It's Over: The Appellate Mandate in Texas Courts*, 15 THE APPELLATE ADVOCATE: STATE BAR OF TEXAS APPELLATE SECTION REPORT 4, 8 (2003).

**3.** As to the authority of a court to reissue an opinion on its own motion, see *Raborn v. Davis*, 795 S.W.2d 716, 717 (Tex.1990) (holding that the Court, after settlement and change in the law, "on its own motion, vacates its opinion and judgment"); *Cocke v. Smith*, 142 Tex. 396, 179 S.W.2d 958, 958 (1944) (holding, after granting mandamus petition, that "[u]pon further consideration of this matter by this court upon its own motion, we are of the opinion that we are without jurisdiction to grant such writ"); *Prouty v. Musquiz*, 94 Tex. 87, 58 S.W. 996, 996 (1900) (holding that where the Court discovers error in its answer to certified question, "[i]t is proper that the mistake should be rectified, and therefore, of our own motion, we order that the specific answer given in our former opinion be set aside, and that in lieu thereof the following answer be certified . . .").

**4.** The City of San Antonio likewise refers to the issuance of the mandate as "a purely ministerial procedure."

**5.** *See* TEX.R.APP. P. 51.1 (providing that the appellate clerk must prepare a mandate and that the appellate court's judgment must be enforced in the trial court once the trial court receives the mandate); TEX.R.APP. P. 65.2 (providing that the trial court clerk must enforce the judgment of the Supreme Court upon receipt of the Court's mandate); *In re Ford Motor Co.*, 165 S.W.3d 315, 321 (Tex.2005) (orig.proceeding) (noting that plaintiff has no right to recover damages from defendant "unless or until a mandate to that effect issues after trial, judgment, and possible appeals").

**6.** *See* TEX. ALCO. BEV.CODE § 61.34(c) ("If a license is issued on the basis of a district court judgment and that judgment is reversed on appeal, the mandate of the appellate court automatically invalidates the license and the applicant is entitled to a proportionate refund of fees for the unexpired portion of the license."); TEX. BUS. CORP. ACT art. 7.02 § F (providing that if judgment of revocation or dissolution of corporate certificate of authority is appealed, appellate court shall in certain circumstances "remand the case to the trial court with instructions to grant the corporation opportunity to cure such defaults, such cure to be accomplished within such time after issuance of the mandate as the appellate court shall determine but in no event more than sixty (60) days thereafter"); TEX. GOV'T CODE § 30.00142(d) (providing that appointment of special appellate judge "automatically terminates at the time the mandate or man-

meaningful purpose there would be no need to require one.

In addition, Texas Rule of Appellate Procedure 18.6 makes clear that appellate-court judgments in accelerated appeals, when time is of the essence, are not effective until the mandate issues. It would be peculiar to hold, as the Authority urges, that our judgment in an ordinary, unexpedited appeal takes effect instantly when the rules make plain that our judgment in an accelerated appeal [7] takes effect only "when the mandate is issued." [8]

The parties make several arguments as to whether the trial court's judgment was superseded while *Barshop* was on appeal, and whether the trial court was obliged to follow *Barshop* immediately upon its issuance. The Authority argues the State was exempt from the requirement of filing a supersedeas bond under Section 6.001 of the Civil Practice and Remedies Code, and therefore the trial court's declaratory judgment was automatically suspended when the State perfected its appeal.[9]

The Authority also argues that the trial court's injunction against enforcement of the Act dissolved immediately when we issued our decision in *Barshop*. The Authority cites *Poole v. Giles*, where we stated that an appellate "order dissolving a temporary injunction is effective immediately even though not final." [10] It further cites *Texas Workers' Compensation Commission v. Garcia*, in which we observed that even though the trial court and court

of appeals had declared the Workers' Compensation Act unconstitutional, they had not issued injunctions, and the Workers' Compensation Commission had "accordingly continued implementing the Act notwithstanding the judgments of the courts below." [11] In contrast, we stated in *Barshop* that "[b]ecause of the district court's injunction," the Act "has yet to be implemented," but we concluded by holding that the injunction "is dissolved." [12]

The court of appeals distinguished the trial court's injunction and its declaratory judgment, reasoning that even if, immediately after our *Barshop* decision, "the district court could not enforce its injunction with contempt power ... this does not mean that the supreme court's judgment declaring the [Act] constitutional and reversing the district court's contrary declaration also became effective at that time." [13] Chemical Lime, too, contends that the *Barshop* judgment had no effect on the trial court's declaratory judgment until our mandate issued, and that "[d]istinctions between injunctive and declaratory relief are irrelevant for this purpose."

Chemical Lime further takes issue with the Authority's contention that the State's notice of appeal in *Barshop* automatically superseded the trial court's judgment, characterizing this position as inconsistent with the position the State took in *Barshop*. In *Barshop* we noted the State's position that it was before the Court

---

dates issue in the case he was appointed to hear").

7. *See* Tex.R.App. P. 28.1.

8. Tex.R.App. P. 18.6.

9. The State makes this argument as well, contending that its "notice of appeal in *Barshop* automatically superseded the trial court's judgment."

10. *Poole v. Giles*, 151 Tex. 224, 248 S.W.2d 464, 465 (1952).

11. *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 517 (Tex.1995).

12. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 625, 638 (Tex.1996).

13. 212 S.W.3d at 694.

"seeking authorization to implement the Act," and that we should construe the Act "to merely require that the declarations be filed with the Authority six months after the *eventual* effective date of the statute."[14] Chemical Lime argues that even if ordinarily the State was not required to post a supersedeas bond, the trial court in *Barshop* purported in its judgment to exercise its discretion "to deny supersedeas of this Judgment." Chemical Lime contends the State chose not to challenge the order denying supersedeas and should not now be heard to argue that its notice of appeal in *Barshop* automatically superseded the judgment in that case.[15] Indeed, taking the Authority's argument to its logical conclusion might mean the Act was effective when the State filed its notice of appeal in *Barshop* in 1995, and the six-month window for filing declarations of historical use expired before our opinion issued on June 28, 1996.

As the Court notes, these arguments regarding supersedeas and other issues are not dispositive,[16] and they obscure a key point. I do not believe the trial court or the parties would have acted in a manner inconsistent with our opinion in *Barshop* after it issued, regardless of whether, in some technical sense, the injunction immediately dissolved when we so stated in *Barshop* or the trial-court judgment was superseded at the time. I assuredly do not suggest parties may flout an appellate-court decision or judgment merely because the mandate has not yet issued.

Nevertheless, our *Barshop* decision was still not "final"[17] when issued in one important sense: *We* were still free to reconsider it and hold the Act unconstitutional or otherwise correct or modify our opinion or judgment. This authority of the issuing court to modify its own opinion or judgment ordinarily extends until the mandate issues, regardless of whether the judgment awards monetary, injunctive, or declaratory relief.

Although in exceptional circumstances we can recall the mandate,[18] the date of the mandate is ordinarily the appellate court's formal and final order signaling it is finished with its review of the case and considers its decision final and its judgment enforceable.[19] Indeed, by correspondence the clerk advised the trial court and

14. *Barshop*, 925 S.W.2d at 628 (emphasis added).

15. The State contends it had concluded in the *Barshop* appeal that "it would make little sense to implement the Act while the direct appeal was pending," and that it voluntarily chose to delay implementation of the permit program, but that the trial court in *Barshop* nevertheless erred in reasoning that it could deny supersedeas of its judgment. The State argues that its notice of appeal in *Barshop* automatically superseded the trial court's judgment and that its subsequent conduct in that appeal did not effect a waiver of the automatic suspension of the judgment, issues the Court need not resolve today.

16. 291 S.W.3d at 411 n. 45. As the Authority argues in its briefing, "The effective date of the Act should not turn on a complex question of law regarding whether and in what circumstances supersedeas is automatic under a tangled web of facts regarding supersedeas at the trial court in the *Barshop* case (which are outside the record in this case)."

17. I caution that "final" for purposes of describing a judgment has several meanings, and can, depending on the context, refer to finality for purposes of determining (1) whether the judgment is appealable, (2) whether the time for altering the judgment has expired, or (3) whether the judgment operates as res judicata. *See Sultan v. Mathew*, 178 S.W.3d 747, 751 (Tex.2005).

18. *See* Tex.R.App. P. 18.7.

19. *See In re Long*, 984 S.W.2d 623, 626 (Tex. 1999) (orig.proceeding) (per curiam) (noting that appeal was not "exhausted" or "final" until court of appeals issued its mandate); *Traders & Gen. Ins. Co. v. Hicks Rubber Co.*, 140 Tex. 586, 169 S.W.2d 142, 145 (1943)

parties in *Barshop* as follows when the mandate issued: "The judgment of the Supreme Court of Texas is now final in the above referenced cause. As Rule 186, Tex. R.App. P., has been satisfied, we have issued the mandate as of today." As the court of appeals aptly noted, the period between judgment and mandate affords the court "the opportunity to correct an appellate judgment before commanding its execution and enforcement in the lower court."[20] An appellate court can issue a mandate earlier than the rules ordinarily prescribe if it has good cause for making its judgment more immediately final and enforceable.[21] Moreover, this Court has discretion to shorten the time for filing a motion for rehearing or even to disallow such a motion altogether.[22] Again, if opinions were immediately final for all purposes upon issuance, there would be no need for a mandate and no reason for courts sometimes to issue mandates early or to shorten the usual timetable for rehearing motions.

The date of the mandate, therefore, is generally the date the parties' duties become fixed.[23] In this case, it was the date that all uncertainties regarding the Act's constitutionality were finally and definitively dispelled.

JUSTICE BRISTER points out many peculiarities in the law (complicated, it seems, by our inconsistent adherence to myriad rules and internal practices).[24] As between the opinion and the judgment, I

("After the judgment in the J.W. Harper suit became final, mandate was duly issued and returned to the district court."); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 302, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) ("The United States Court of Appeals for the Fifth Circuit affirmed, issuing its mandate on October 12, 1990, and thus rendering 'final' respondents' judgment against Celotex."); *Charpentier v. Ortco Contractors*, 480 F.3d 710, 713 (5th Cir.2007) ("Before our mandate issues, we have the power to alter or modify our judgment. Accordingly, our decision is not final until we issue a mandate." (footnotes omitted)); *In re City of Cresson*, 245 S.W.3d 72, 74 (Tex.App.-Fort Worth 2008, orig. proceeding) ("It is true that this court's judgment is not enforceable in the trial court until it is final and mandate issues.").

Indeed, it is not uncommon for parties to jointly request that the Court expedite issuance of the mandate so the parties can complete a settlement and ask the trial court to issue an agreed dismissal order. *See* TEX. R.APP. P. 18.1(c) (allowing for early issuance of the mandate "if the parties so agree, or for good cause on the motion of a party").

**20.** 212 S.W.3d at 695.

**21.** *See* TEX.R.APP. P. 18.1(c). The United States Supreme Court has on occasion followed a similar procedure. *See Bush v. Gore*, 531 U.S. 98, 111, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("Pursuant to this Court's Rule 45.2, the Clerk is directed to issue the mandate in this case forthwith."); *United States v. Nixon*, 418 U.S. 683, 716, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("Since this matter came before the Court during the pendency of a criminal prosecution, and on representations that time is of the essence, the mandate shall issue forthwith.").

**22.** TEX.R.APP. P. 64.1.

**23.** *See* FED. R.APP. P. 41(c) advisory committee's note (1998 amendments) ("A court of appeals' judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed.").

**24.** I do question the persuasiveness of some of JUSTICE BRISTER's comparisons, such as his references to mandamus proceedings, "which we decide by 'orders' rather than 'judgments.'" 291 S.W.3d at 409 (Brister, J., concurring). The fact that we don't issue mandates in mandamus cases—typically involving interlocutory, conditional, emergency rulings directed to the lower court only and not the parties—seems unrelated to the question of the mandate's effect in a case involving a final, unconditional judgment. (In fairness, I also make some reference to interlocutory appeals and mandamus law.) Our settled practice is to grant writs of mandamus only conditionally, with our final sentence usually reading something like this: "We are confi-

agree with JUSTICE BRISTER that the judgment is more "operative"—the judgment takes action; the opinion explains why. I also agree that "judgments should mean what they say," but the question remains: Which judgment? [25] An appellate court can reconsider its judgment and the opinion on which it rests until the mandate issues, the date finality attaches.[26]

dent the trial court will comply, and our writ will issue only if it does not." *In re Schmitz,* 285 S.W.3d 451 (Tex.2009). So while a writ will issue when necessary to enforce our decision and require the respondent to take action—similar to a mandate in an appeal—we rarely have to do so.

I also cannot completely agree with JUSTICE BRISTER's assertion that no mandate issues when we deny a petition for review. 291 S.W.3d at 409 (Brister, J., concurring). If we deny a petition, the court of appeals then issues a mandate to enforce its judgment. *See* TEX.R.APP. P. 18.1(a)(2).

25. JUSTICE BRISTER states, "First of all, we should start with the principle that cases are decided by judgments, not mandates. Judgments are rendered by the court, and a majority of the court must agree to them. Mandates, by contrast, are drafted and signed by the clerk; judges rarely even see them." 291 S.W.3d at 411 (Brister, J., concurring) (footnotes omitted). Until this case, I had certainly never seen a mandate. But I have a slightly different view, which may be more stylistic than substantive. While judgments are in a sense more "operative" than opinions, I think cases are decided—that is to say *reasoned*—by opinions, not judgments. The judgment, like the mandate, is a separate document that sets forth the court's bottom-line decision and addresses the payment of costs. And like mandates, judgments are drafted by the Court's staff and usually not reviewed by judges. Our judgments, for example, are not signed by anyone, either a judge or anyone in the clerk's office. But the fact that the Court designates a task to its staff doesn't mean the action taken is not an official act of the Court, nor does it diminish its significance. Our mandates state, "[W]e **command you** to observe the order of our said Supreme Court in the behalf, and in all things to have recognized,

I appreciate JUSTICE BRISTER's point that the judgment merits instant respect. But if a judgment is operative for all purposes upon issuance, what exactly is the mandate of a mandate—why enact rules and statutes that tie finality and enforceability to something that amounts to *Seinfeld*-ian

obeyed, and executed." (emphasis in original). And by its terms, the mandate is issued "BY ORDER OF THE SUPREME COURT OF THE STATE OF TEXAS."

26. JUSTICE BRISTER contends the mandate is an imperfect proxy for finality because "mandates issue 10 days *after* our judgment is final"—so why postpone the effective date for ten days if the judgment is final? 291 S.W.3d at 411 (Brister, J., concurring) (footnote omitted). This ten-day period sometimes applies, but not always, and there is a sound practical reason for it. When the Court denies rehearing, the mandate issues immediately because the judgment is final. There is no second motion for rehearing. TEX.R.APP. P. 64.4. When no rehearing is sought, the mandate issues ten days after the deadline for filing a motion for rehearing or seeking an extension of time to file such a motion—that is, forty days after judgment. *See* TEX.R.APP. P. 64.1 ("[a] motion for rehearing may be filed ... within 15 days from the date when the Court renders judgment"); TEX.R.APP. P. 64.5 ("[t]he Court may extend the time to file a motion for rehearing ... if a motion ... is filed ... no later than 15 days after the last date for filing a motion for rehearing"); TEX.R.APP. P. 18.1(b) (the clerk must issue the mandate "[t]en days after the time has expired for filing a motion to extend time to file a motion for rehearing"). The ten-day postponement is justified by the so-called mailbox rule, which provides that if a motion is received within ten days of the filing deadline it is considered timely filed if it was sent to the proper clerk by U.S. mail in a properly addressed envelope and deposited in the mail on or before the last day of filing. *See* TEX R.APP. P. 9.2(b). Since the Court has no way of knowing whether a motion for rehearing or an extension of time to file a motion for rehearing will be timely filed until ten days after the deadline, we simply factor in the mailbox rule and sit tight.

nothingness?[27] It seems odd that a decision would be fully effective yet neither final nor enforceable.[28]

I agree with the Court that our decision in *Barshop* itself decides today's case. I agree, too, with JUSTICE BRISTER that our decisions "can take effect whenever we say they do,"[29] but as a general default rule, I would treat the mandate as a more-than-clerical act. It is the judicial equivalent of "Yes, that's my final answer"—the dispositive order concluding the appeal, declaring the judgment final and enforceable, and commanding that the judgment be "recognized, obeyed, and executed." I trust the Court's rulemaking process will focus its expertise on this important issue and deliver bright-line guidance going forward.

---

**27.** Not that there's anything wrong with that. As a matter of fact—and law—there *is* something wrong with that.

**28.** *See* TEX.R.APP. P. 51, 65.

**29.** 291 S.W.3d at 406 (Brister, J., concurring). In *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 851 (Tex.1979), we stated what I believe is a sensible general rule, deeming "this opinion to be effective ... after the date on which our judgment herein becomes final," which we clarified in a later case was "the date of the overruling of the last motion for rehearing," *Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 115 (Tex.1984). That date happens to be when the mandate issues. Interestingly, we decided *Acord* just seventeen days after amending a rule making it clear that a court's judgment regarding an interlocutory order did not take effect until the mandate issued. Steven McConnico & Daniel W. Bishop II, *Practicing Law with the 1984 Rules: Texas Rules of Civil Procedure Amendments Effective April 1, 1984,* 36 BAYLOR L.REV 73, 120–21 (1984).